UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

KELLY MANNO,                                   :
                                               :      Case No. 1:21-cv-10642-DLC
                        Plaintiff,             :
                                               :
        - against -                            :
                                               :
MICHAEL CHE CAMPBELL p/k/a MICHAEL             :
CHE, REGGIE CONQUEST, UNIVERSAL                :
TELEVISION LLC, NBCUNIVERSAL                   :
MEDIA, LLC, THE BROADWAY VIDEO                 :
GROUP, INC., LEATHER SUIT, INC., IRONY         :
POINT, LLC, WARNERMEDIA, LLC d/b/a             :
HBO MAX, and DOES 1-10,                        :
                                               :
                        Defendants.            :
-------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Nicolas A. Jampol (*pro hac vice* pending)
Cydney Swofford Freeman
Joel Richert (*pro hac vice* pending)
DAVIS WRIGHT TREMAINE LLP
868 S. Figueroa Street, Suite 2400
Los Angeles, CA  90017
(213) 633-6800 Phone
(213) 633-6899 Fax
nicolasjampol@dwt.com
cydneyfreeman@dwt.com
joelrichert@dwt.com

Raphael Holoszyc-Pimentel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax
rhp@dwt.com

*Attorneys for Defendants*
*Irony Point, LLC, NBCUniversal Media, LLC, Universal Television LLC, Warner Media, LLC,*
*The Broadway Video Group, LLC, Leather Suit, Inc., Michael Che Campbell,*
*and Reggie Conquest*

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...........................................................................................................1

II.   FACTUAL BACKGROUND ......................................................................................2

    A.   Plaintiff's "HomeGirl Hotline" Videos ...........................................................2

    B.   Defendants' Episode of *That Damn Michael Che* ..........................................4

    C.   The Lawsuit .....................................................................................................7

III.   PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ACCESS .................................8

IV.   THE WORKS ARE NOT SUBSTANTIALLY SIMILAR ...............................11

    A.   Lack of Substantial Similarity May Be Decided on a Motion to Dismiss..................11

    B.   The Alleged Similarities Between the Works Are Unprotectible..............................12

    C.   The Works' Protectible Expression Is Not Substantially Similar................................17

        1.   Plot and Sequence of Events................................................................17

        2.   Characters ............................................................................................18

        3.   Settings.................................................................................................20

        4.   Themes .................................................................................................21

        5.   Pace .....................................................................................................21

        6.   Total Concept and Feel ........................................................................22

V.   PLAINTIFF'S SECONDARY LIABILITY CLAIMS FAIL................................23

    A.   Plaintiff Fails to Adequately Plead Contributory or Vicarious Infringement.............23

    B.   Plaintiff's "Public Performance" Theory Is Untenable ................................24

VI.   CONCLUSION.........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abdin v. CBS Broad.*,
   971 F.3d 57 (2d Cir. 2020)..........................................................................11, 12, 14

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
   573 U.S. 431 (2014).........................................................................................24

*Amanze v. Adeyemi*,
   2019 WL 2866071 (S.D.N.Y. July 3, 2019), *aff'd* 824 F. App'x 86 (2d Cir.
   2020) ..............................................................................................................20

*Arden v. Columbia Pictures*,
   908 F. Supp. 1248 (S.D.N.Y. 1995)..................................................................22

*Batts v. Adams*,
   2011 WL 13217923 (C.D. Cal. Feb. 8, 2011)......................................................9

*Clanton v. UMG Recordings, Inc.*,
   2021 WL 3621784 (S.D.N.Y. Aug. 16, 2021)...............................................8, 9, 10

*DiFolco v. MSNBC Cable*,
   622 F.3d 104 (2d Cir. 2010)..............................................................................15

*DiTocco v. Riordan*,
   815 F. Supp. 2d 655 (S.D.N.Y. 2011)................................................................14

*Dress Barn, Inc. v. Klauber Bros.*,
   2019 WL 1949675 (S.D.N.Y. Apr. 22, 2019)......................................................9

*Edwards v. Raymond*,
   22 F. Supp. 3d 293 (S.D.N.Y. 2014) (Cote, J.)..................................................21

*Faulkner v. Nat'l Geographic Enters*,
   409 F. 3d 26 (2d Cir. 2005)...............................................................................23

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir. 1988).............................................................................8

*Gottlieb Dev. v Paramount Pictures*,
   590 F. Supp. 2d 625 (S.D.N.Y. 2008)...........................................................11, 13

*Green v. Harbach*,
   2018 WL 3350329 (S.D.N.Y. July 9, 2018), *aff'd,* 750 F. App'x 57 (2d Cir.
   2019) ..............................................................................................................11

4875-4201-5250v.2 0113986-000003

*Hartmann v. Amazon.com, Inc.*,
   2021 WL 3683510 (S.D.N.Y. Aug. 19, 2021) ...............................................................23, 24

*Hoehling v. Universal City Studios*,
   618 F.2d 972 (2d Cir. 1980).....................................................................................13

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999)........................................................................18

*Hord v. Jackson*,
   281 F. Supp. 3d 417 (S.D.N.Y. 2017).......................................................................24

*Hord v. Jackson*,
   281 F. Supp. 3d 417 (S.D.N.Y. 2017).......................................................................15

*Jones v. CBS*,
   733 F. Supp. 748 (S.D.N.Y. 1990) ...........................................................................22

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003).........................................................................................8

*Kregos v. Associated Press*,
   3 F.3d 656 (2d Cir. 1993)............................................................................................8

*Ludlow Essex Partners v. Wells Fargo Bank*,
   2017 WL 2963488 (S.D.N.Y. July 11, 2017) ...........................................................24

*Manno v. Campbell et al.*,
   Case No. 1:21-cv-07666-PAE-KNF ............................................................................7

*Mowry v. Viacom Intern.*,
   2005 WL 1793773 (S.D.N.Y. July 29, 2005) ............................................................10

*Nobile v. Watts*,
   747 F. App'x 879 (2d Cir. 2018) ...............................................................................13

*Peter F. Gaito Architecture v. Simone Dev. Corp.*,
   602 F. 3d 57 (2d Cir. 2010)..................................................................................11, 12

*Polsby v. St. Martin's Press, Inc.*,
   8 F. App'x 90 (2d Cir. 2001) .....................................................................................12

*Porto v. Guirgis*,
   659 F. Supp. 2d 597 (S.D.N.Y. 2009)........................................................................14

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997)..................................................................................8, 10

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976)............................................................................13, 17, 22

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010)...................................................................14

*Shull v. TBTF Prods.*,
    2021 WL 3027181 (2d Cir. July 19, 2021)............................................................11

*Tanksley v. Daniels*,
    902 F.3d 165 (3d Cir. 2018)................................................................................19

*Vacchi v. E\*TRADE Financial Corp.*,
    2019 WL 4392794 (S.D.N.Y. Sept. 13, 2019)..........................................12, 13, 19

*Vargas v. Transeau*,
    514 F. Supp. 2d 439 (S.D.N.Y. 2007), *aff'd sub nom. Vargas v. Pfizer*, 352 F.
    App'x 458 (2d Cir. 2009)...................................................................................11

*Wager v. Littell*,
    2013 WL 1234951 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir.
    2014) .................................................................................................................8

*Walker v. Time Life Films*,
    784 F.2d 44 (2d Cir. 1986)................................................................12, 13, 14, 16

*Webb v. Stallone*,
    910 F. Supp. 2d 681 (S.D.N.Y. 2012)....................................................................8

*Williams v. A & E Television Networks*,
    122 F. Supp. 3d 157 (S.D.N.Y. 2015)........................................................ *passim*

*Zalewski v. Cicero Builder Dev.*,
    754 F.3d 95 (2d Cir. 2014).................................................................................12

**Federal Statutes**

17 U.S.C. § 505.......................................................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................1, 11, 13

Fed. R. Evid. 201 ..................................................................................................15

Defendants Irony Point, LLC, NBCUniversal Media, LLC, Universal Television LLC, Warner Media, LLC, The Broadway Video Group, LLC, Leather Suit, Inc., Michael Che Campbell (professionally known as "Michael Che"), and Reggie Conquest (collectively, "Defendants") submit this memorandum of law in support of their motion for an order dismissing the First Amended Complaint ("FAC") pursuant to Fed. R. Civ. P. 12(b)(6) and awarding Defendants their attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## I.      INTRODUCTION

In this case, plaintiff Kelly Manno ("Plaintiff") asserts copyright-infringement claims against eight defendants based on deficient allegations and unprotectible alleged similarities between two of her one-minute-long social media videos ("Plaintiff's Videos") and Defendants' critically acclaimed HBO Max series *That Damn Michael Che* (the "Series"), featuring comedian and *Saturday Night Live* co-head writer Michael Che ("Che"). Based on the allegations in the FAC, the works themselves, and other content incorporated into the FAC or subject to judicial notice, Plaintiff fails to state a valid claim under well-established law.

*First*, despite a requirement that Plaintiff allege *facts* to support an inference that Defendants had access to Plaintiff's Videos, the FAC alleges only that the videos are accessible on TikTok, Facebook, and Instagram (FAC ¶¶ 28-29, Dkt. 18), which are social media platforms with literally *billions* of videos. These allegations reflect nothing more than a "bare possibility" that Defendants accessed Plaintiff's Videos, which courts routinely hold is insufficient to state a valid copyright claim. *See* Section III.

*Second*, the works at issue are not anywhere close to substantially similar in their protected expression. The primary alleged similarity between the works – that they portray a fictional service by which people can order a "homegirl" to deal with some problem – is a quintessential unprotectible idea. FAC ¶¶ 15-16. While the law is clear that nobody can own the

1

exclusive right to a high-level concept such as this, even if they could, the FAC's highly abstracted characterizations of the works at issue are misleading.  The protectible elements of each work are, in fact, highly dissimilar and not remotely sufficient to establish a valid claim for copyright infringement as a matter of law.  Courts *routinely* dismiss copyright lawsuits like this one on motions to dismiss where the alleged similarities consist primarily (or entirely) of unprotectible elements and any remaining protectible elements are not substantially similar, much less strikingly similar, as a matter of law.  *See* Section IV.

*Finally*, Plaintiff's allegations for contributory and vicarious infringement fail, both because secondary liability cannot exist in the absence of direct infringement and also because Plaintiff has failed to plead *sufficient* facts to plausibly support such claims.  *See* Section V.

Plaintiff has now had *three* opportunities to plead a valid claim – once in a separate action that she voluntarily dismissed, once in her original complaint in this action, and now in her FAC.  Plaintiff should not be given a fourth chance.  For the reasons set forth above and explained below, Defendants respectfully request that the Court dismiss this action with prejudice.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff's "HomeGirl Hotline" Videos

Plaintiff alleges that she created two videos titled "HomeGirl Hotline," each of which includes the premise of "a fictional service by which people can call a hotline and order a 'homegirl.'"  FAC ¶ 15.  To define "homegirl," the FAC proffers an internet dictionary definition that a "homegirl" is "a girl who is a friend to the end no matter what goes down you know she got your back."  *Id.*  Plaintiff alleges that, on August 9, 2020, she posted the first of the two

videos (the "First Video") on TikTok, Instagram, and Facebook. *Id.* ¶ 28.[1]  The description for

the First Video states: "HOMEGIRL (noun) a friend who's always down to do sketchy s**t with

you."  *Id.*  In the First Video, which is slightly under one minute long, a distraught woman (who

appears to be played by Plaintiff) calls a "HomeGirl Hotline" and tells the operator (who also

appears to be played by Plaintiff) that her husband had an affair.  The operator asks several

questions about the husband's location and says, "I am dispatching a homegirl right now.  I need

you to leave the front door unlocked for her.  You can feel free to go back to bed, and then we

will call you when we are finished."  The caller says, "Thank you, HomeGirl Hotline," and the

operator responds, "You did the right thing by calling us."

Following the call with the operator, the First Video then cuts to a woman (who also

appears to be played by Plaintiff) wearing a "HOMEGIRL" hoodie, backwards baseball cap, and

reflective sunglasses walking down the street while music plays.  The video displays the message

"GET YOUR 'HOMEGIRL HOODIE' AT KELLYMANNO.COM."  *See* FAC ¶ 23 (describing

the interlude as "an advertisement … for the purchase of 'homegirl hoodies' at

kellymanno.com").  After arriving at the caller's house, the woman then throws the caller's

husband's clothes out of an upstairs window and then slashes his truck's tires.  The video then

again urges viewers to "GET YOUR 'HOMEGIRL HOODIE' AT KELLYMANNO.COM."  *See*

*id.* ¶ 24 ("At the end of the video, a second ad for 'homegirl' apparel appears[.]").

---

[1] The First Video is available at this link: https://www.tiktok.com/@kellymanno/video/
6859200303514848518.  Defendants will lodge the First Video as Exhibit B to the declaration of
Cydney Swofford Freeman in support of this motion ("Freeman Decl.").

Plaintiff alleges that, on September 4, 2020, she posted the second of the two videos (the "Second Video") on TikTok, Instagram, and Facebook.  FAC ¶ 29.[2]  In this video, Plaintiff appears to reprise her role as the "HomeGirl Hotline" operator, this time receiving a call from a mother (who also appears to be played by Plaintiff) whose 10-year-old son is being bullied at school by a boy named Brady.  The caller says that the bully gave her son a "noogie," kicked him, and did a "five-knuckle shuffle," the signature wrestling move by wrestler John Cena.  The operator tells the mother, "We are dispatching a homegirl right now.  What is the bully's home address?"  The hotline then sends the same "homegirl" from the First Video (again, apparently Plaintiff) to the bully's house.  While music plays, the homegirl drives her truck onto a lawn, rolls down her window, and asks a young boy if he is Brady.  The homegirl gets out of her truck and then proceeds to perform the same moves on the bully's mother that the bully did to the caller's son, while John Cena's wrestling entrance song plays underneath.  Like the First Video, the Second Video also ends with another "advertisement for 'Homegirl Hoodies.'"  FAC ¶ 26.

B.   **Defendants' Episode of *That Damn Michael Che***

Defendants are the writers, actors, producers, and/or distributors of the Series.  Each episode in the Series features sketches weaved together with common themes.  In the Series' sixth episode (the "Episode"), Che's character attends confession in a Catholic Church in anticipation of an important professional milestone (performing at Madison Square Garden), and Reggie Conquest's character has a doctor's appointment in which he must confront physical insecurities before an attractive nurse.  Freeman Decl., Ex. A.[3]

_____

[2] The Second Video is available at this link: https://www.tiktok.com/@kellymanno/video/6868803242634005765.  Defendants will lodge the Second Video as Exhibit C to the Freeman Decl.

[3] Defendants will lodge the Episode as Exhibit A to the Freeman Decl.  Defendants will also email Chambers and opposing counsel a Dropbox link with a digital copy of the Episode.

While in confession, Che's character recounts (and the Episode portrays) walking up to a female bouncer at a club to see if she will let him and his friends skip the long line because he is a celebrity.  The bouncer says she knows who he is, but refuses to let him in.  The Episode then shows Che in confession, saying "I don't think she had to be such a jerk about it.  I mean, it's not even her club, she just worked the door.  It was like she took pleasure in shutting me down."  Ex. A at 4:25.  The priest asks Che's character how it made him feel to be treated that way, and he responds, "Honestly?  I felt like punching her right in the top of her head, right in the soft spot."  Che's character quickly clarifies that he "said '*felt like*,' okay?  Obviously I wouldn't hit a girl.  I don't want to get cancelled by the liberal media."  He asks the priest, "Do you ever want to sock a lady because she made you feel small in front of your friends?"  Ex. A at 7:00.

At this point, the Episode cuts to the first of three comedic infomercial-like sketches (the "Sketches") about a fictional app called "homegrrl," which offers men the ability to hire a woman to fight another woman on the man's behalf (because, as Che explained in confession, a man hitting a woman would result in being "cancelled").  In this sketch, a male grocery store clerk refuses to ring up thirty cans of cat food because the female shopper is in the "10 items or less" aisle.  The woman says, "Just ring up my s**t," and then yells, "F**k you!" and slaps the male clerk as the crowd gasps and people take out their cell phones to record.  Ex. A at 7:45.

At that moment, a narrator's voice – clearly parodying the over-the-top narration style of infomercials – asks, "Has this ever happened to you?  Crazy lady rocks your s**t in public and you can't do anything about it?"  The clerk says he will call the police, but his coworker says, "Wow, you really gonna call the police on a lady?"  The clerk shakes his head and looks directly to the camera with the quintessential infomercial plea: "There's gotta be a better way."  The narrator replies: "Now there is!  With the all new 'homegrrl' app!  The 'homegrrl' app lets you

5

order a homegirl to fight for you when your hands are tied."  The clerk opens the "homegrrl" app

on his phone, which resembles, and is plainly intended to evoke, many "gig economy" apps for

rideshare and food delivery.  Shortly after the clerk clicks "Request homegrrl" in the app, a

woman in a tracksuit with a "homegrrl" ID badge appears and says "homegrrl for Sean," evoking

the standard rideshare greeting "Uber [or Lyft] for [passenger's name]."  The clerk replies,

"Yeah, that's me.  Could you hit her?"  She then beats up the unruly shopper.  With the customer

knocked out, the clerk says, "Thanks, homegrrl," and she responds, "Please rate me five stars,"

again evoking rideshare and delivery apps.  Ex. A at 7:55.  *See also* FAC ¶ 34 (screenshot).

A second "homegrrl" sketch immediately follows, in which a man has rear-ended a

woman's SUV at a stop sign.  The woman calls him a "dumba**" and dumps her milkshake on

him.  "One second," the man states calmly (with milkshake all over him), as he requests a

"homegrrl" through the app.  A woman shows up to the scene and asks, "Who ordered the

homegrrl Black?"  (A reference to Uber's premium "Uber Black" service.)  The hired homegrrl

offers the man gum and water (as premium rideshare drivers often do), and says, "I should be

done beating her a** in about four minutes," before chasing down the woman who threw the

milkshake.  The man yells after her, "Thanks, Coco!" and then turns to the camera and says,

"And thank you, homegrrl."  Ex. A at 8:45.  *See also* FAC ¶ 37 (screenshot).

Immediately after that sketch, to further bolster the premise of the homegrrl app, the

Episode shows Che in an interview explaining that "every good family has one girl that could

fight, that's your job, that one hockey goon."  He asks, "Some girl bully you?" and answers that

you should call that one family member who can fight.  "And if she wasn't in your family, you

call your homegirl.  You need a homegirl."  Ex. A at 9:15.  *See also* FAC ¶ 38 (screenshots).

4875-4201-5250v.2 0113986-000003

Several minutes later, the Episode's third "homegrrl" sketch opens with a mid-30s white woman nicknamed "NoHo Karen" struggling to escape the arms of a hotel bellhop holding her back, yelling that a Black man's toddler stole her phone ("It's in his diaper!").  The man replies that his son is not a thief, but the woman tackles the child.  The man yells, "What the f**k is wrong with you?" and starts to walk toward the woman.  Out of nowhere, another woman in sweats and a fanny pack – a homegrrl – puts her arm out and says, "No, no, no, I got this!"  She then punches NoHo Karen several times, before receiving a notification presumably that she received a new request (like rideshare drivers).  Ex. A at 13:03.  *See also* FAC ¶ 43 (screenshot).

Lastly, one of the Episode's final scenes includes a callback to the Sketches.  Conquest's character enters a bar and sees his nurse (shown earlier in the Episode examining Conquest during a doctor's visit) joking with a friend about the size of Conquest's genitalia.  As Conquest convinces the group to spend the evening elsewhere, he pulls out his phone and opens the homegrrl app, impliedly to request a homegrrl to deal with the nurse who was laughing at him.  Ex. A at 18:25.  *See also* FAC ¶ 44 (screenshot).

## C.     The Lawsuit

On September 14, 2021, Plaintiff filed a complaint in this District for direct, contributory, and vicarious copyright infringement based on the same set of allegations.  *See Manno v. Campbell et al.*, Case No. 1:21-cv-07666-PAE.  Plaintiff filed her complaint before the Second Video was registered with the Copyright Office.  *See id.*, Dkt. 1 (Complaint) ¶ 1 n.1 ("An application for registration of the second skit is pending before the U.S. Copyright Office.").  Plaintiff voluntarily dismissed the prior complaint without prejudice following an initial conference before the Hon. Judge Engelmayer on November 3, 2021.  *See id.*, Dkts. 30, 41.

Plaintiff refiled her complaint on December 13, 2021, alleging that the Second Video now is registered with the Copyright Office.  Compl. ¶ 14, Dkt. 1.  On February 11, 2022,

Defendants moved to dismiss the complaint.  Dkt. 11.  Plaintiff amended her complaint on

March 4, 2022.  Dkt. 18.  Defendants now move to dismiss the FAC with prejudice.

### III.    PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ACCESS

"Copyright infringement is established when the owner of a valid copyright demonstrates

unauthorized copying."  *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997).  And because "direct

evidence of copying is rarely possible, copying is generally established by showing (a) that the

defendant had access to the copyrighted work and (b) the substantial similarity of protectible

material in the two works."  *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir. 1993).

Importantly, access means more than a "bare possibility" that defendants viewed the plaintiff's

work; there must be a *reasonable* possibility.  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51

(2d Cir. 2003) (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)).  That

reasonable possibility must be established by "'significant, affirmative and probative' evidence."

*Wager v. Littell*, 2013 WL 1234951, at *3 (S.D.N.Y. Mar. 26, 2013) (dismissing case for failure

to adequately plead access), *aff'd*, 549 F. App'x 32 (2d Cir. 2014).

There are two ways that a plaintiff can demonstrate access: (a) by establishing a

"particular chain of events" or a "link" from the plaintiff's work to the creators of the allegedly

infringing work; or (b) by establishing that the plaintiff's work was "widely disseminated."  *See*

*Webb v. Stallone*, 910 F. Supp. 2d 681, 686 (S.D.N.Y. 2012), *aff'd on other grounds*, 555 F.

App'x 31 (2d Cir. 2014).  Importantly, "[a]s a matter of law, the fact that [a work] was posted on

the internet is insufficient on its own to show 'wide dissemination.'"  *Clanton v. UMG*

*Recordings*, 2021 WL 3621784, at *3 (S.D.N.Y. Aug. 16, 2021) (granting motion to dismiss).[4]

---

[4] More than a decade ago, a California federal court explained the justification for such a
principle, stating that posting a work on the internet is, by itself, insufficient to establish access
because it "can only be described as the modern-day equivalent of looking for a needle in a

Rather, the plaintiff must make "specific allegations about how many times the [work] was accessed" on the internet and the "time periods during which it was accessed" in order to show that the work "was widely accessed on the internet before publication of the allegedly infringing work." *Id.*

To start, Plaintiff does not adequately allege any "chain or events" or "link" between Plaintiff's Videos and Defendants. She does not allege that any particular Defendant was aware of Plaintiff or watched her videos out of the billions of videos on social media. *See* FAC ¶¶ 49, 53 (alleging that Defendants, "like any other Internet users," had access to Plaintiff's works simply by virtue of their public availability on social media and that Defendants thus, "upon information and belief, accessed and/or viewed" Plaintiff's Videos). Instead, Plaintiff contends that Plaintiff's Videos were widely disseminated (*id.* ¶ 54), but that contention fails.

While the FAC, like the original complaint, alleges the number of views for each of Plaintiff's Videos, those numbers are not limited, as they must be, to the period before the Episode was released. *See Clanton*, 2021 WL 3621784, at *3 (complaint inadequately pleaded "[i]n the absence of specific facts showing that [plaintiff's work] was widely accessed on the internet before publication of the allegedly infringing work"); *Dress Barn, Inc. v. Klauber Bros.*, 2019 WL 1949675, at *5 (S.D.N.Y. Apr. 22, 2019) (Cote, J.) (dismissing claim where plaintiff failed to plead that widespread dissemination "occurred before [defendant] engaged in its allegedly infringing activities"). In fact, the alleged number of views includes another *four months* after the Episode was released. *See* FAC ¶¶ 28-29 (screenshots with videos' view counts as of September 12, 2021); *id.* ¶ 30 (alleging Episode was released on April 16, 2021). These

---

haystack – where the alleged seeker does not know the needle exists, and isn't looking for it." *Batts v. Adams*, 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8, 2011).

allegations of dissemination post-date the alleged infringement and are thus irrelevant and insufficient. *See Clanton*, 2021 WL 3621784, at *3 n.2 (total number of views after defendant published his work "has no bearing on whether [plaintiff's work] was widely disseminated at the time of the alleged infringement"). Plaintiff fails to allege wide dissemination at the relevant time *before* Defendants created and published the Episode.

In her FAC, Plaintiff unsuccessfully attempts to cure this defect. First, she alleges that she garnered one million TikTok *followers* on October 8, 2020, before the Episode was released. FAC ¶ 19. But the number of *followers* says nothing about the number of times those followers (or anyone else) viewed the particular *works* at issue. *See Clanton*, 2021 WL 3621784, at *4 (dismissing complaint where plaintiff failed to allege the relevant "number of listens [or views] that the Subject Work received"). Second, Plaintiff alleges that an unspecified video of hers was shown on a television program. FAC ¶ 20. But dissemination of some *other* video does not equate to, or say anything at all about, dissemination of the particular works at issue in this case. Moreover, Plaintiff's allegations indicate that this television broadcast occurred *after* the Episode was released, rending it entirely irrelevant.[5]

Accordingly, Plaintiff's FAC fails to adequately plead that Defendants had access to Plaintiff's Videos, and should be dismissed for that reason.[6]

---

[5] Plaintiff alleges that the program referenced "her 1.2 million TikTok followers," meaning that it occurred after she reached 1 million followers in October 2020, and the screenshot of the program includes a caption titled "Mother's Day," indicating that it occurred in May 2021 (*after* Plaintiff alleges the Episode was released, in April 2021). FAC ¶¶ 20, 30.

[6] Plaintiff alleges that the works at issue "are strikingly similar, which would establish the element of copying even without direct or circumstantial proof of access." FAC ¶ 72. The Second Circuit has held that "proof of access may be inferred" only if "the two works are so strikingly similar as to preclude the possibility of independent creation." *See Mowry v. Viacom Int'l*, 2005 WL 1793773, at *9 (S.D.N.Y. July 29, 2005) (quoting *Repp*, 132 F.3d at 889) (collecting cases). As explained in Section IV, Plaintiff's Videos and the Episode are not *substantially* similar, much less *strikingly* similar; therefore, a theory of striking similarity cannot

## IV.    THE WORKS ARE NOT SUBSTANTIALLY SIMILAR

In addition to access, copyright plaintiffs must demonstrate that the works at issue are substantially similar in their protected expression.  *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996).  Plaintiff's Videos and the Episode are not substantially similar as a matter of law.

### A.    Lack of Substantial Similarity May Be Decided on a Motion to Dismiss

Courts in the Second Circuit "may resolve the question of substantial similarity as a matter of law at the pleadings stage based on a review of the works in their entirety."  *Shull v. TBTF Prods.*, 2021 WL 3027181, at *2 (2d Cir. July 19, 2021) (affirming dismissal of copyright claims for lack of substantial similarity) (citing *Peter F. Gaito Architecture v. Simone Dev. Corp.*, 602 F.3d 57, 63-65 (2d Cir. 2010)).  Indeed, courts in this Circuit *routinely* grant motions to dismiss copyright claims "either because the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonably jury, properly instructed, could find that the two works are substantially similar."  *Gaito*, 602 F.3d at 63.[7]

Where, as here, the works in question are incorporated into a plaintiff's complaint by reference, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."  *Gaito*, 602 F.3d at 64.  *See also Gottlieb Dev. v Paramount Pictures*, 590 F. Supp. 2d 625, 629-30 & n.1 (S.D.N.Y. 2008) (reviewing two works at issue, including DVD of defendant's movie attached to declaration in support of defendant's

---

save Plaintiff's failure to adequately plead access.  *See Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007) (explaining that striking similarity "requires more than a showing of 'substantial' similarity"), *aff'd sub nom. Vargas v. Pfizer*, 352 F. App'x 458 (2d Cir. 2009).

[7] *See, e.g.*, *Abdin v. CBS Broad.*, 971 F.3d 57, 73 (2d Cir. 2020) (affirming Rule 12(b)(6) dismissal of copyright claims for lack of substantial similarity); *Green v. Harbach*, 2018 WL 3350329, at *1 (S.D.N.Y. July 9, 2018) (granting Rule 12(b)(6) motion to dismiss copyright claims for lack of substantial similarity), *aff'd*, 750 F. App'x 57 (2d Cir. 2019).

4875-4201-5250v.2 0113986-000003

motion to dismiss, because they were "referred to in the complaint" and "integral to [plaintiff's] claims" and finding that the works are not substantially similar).  Importantly, it is not the parties' characterizations or allegations regarding the works that are relevant, but instead it is *the works themselves*.  *Walker v. Time Life Films*, 784 F.2d 44, 51 (2d Cir. 1986) ("[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement."); *Vacchi v. E\*TRADE Fin.*, 2019 WL 4392794, at \*5 (S.D.N.Y. Sept. 13, 2019) (Cote, J.) (same).  Because a determination of substantial similarity is based on an ordinary observer's comparison of the actual works, discovery is not necessary.  *Gaito*, 602 F.3d at 64 (no discovery necessary because "what is required is only a … comparison of the works"); *Polsby v. St. Martin's Press, Inc.*, 8 F. App'x 90, 92 (2d Cir. 2001) (discovery "not necessary for a comparison of the works" to determine substantial similarity).

## B.    The Alleged Similarities Between the Works Are Unprotectible

In determining whether two works are substantially similar, courts in this Circuit apply the "ordinary observer test," asking "whether a lay observer would consider the works as a whole substantially similar to one another."  *Williams*, 84 F.3d at 590.  Critically, where, as here, the works in question contain both protectible and unprotectible elements, the court must apply a "more discerning" ordinary observer test, by which the court "must attempt to extract the unprotectible elements from … consideration and ask whether the protectible elements, standing alone, are substantially similar."  *Vacchi*, 2019 WL 4392794, at \*3-4 (dismissing copyright claims for lack of substantial similarity) (quoting *Gaito*, 602 F.3d at 66).  *See also Abdin*, 971 F.3d at 66 (the "more discerning observer test … requires substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed work"); *Zalewski v. Cicero Builder Dev.*, 754 F.3d 95, 102 (2d Cir. 2014) (the test requires court to "be more discerning, and ignore those aspects of a work that are unprotectable").

Such unprotectible elements, which the "discerning observer" must "attempt to extract" in assessing substantial similarity, include ideas, general concepts, and generic elements. *See Vacchi*, 2019 WL 4392794, at *3. "It is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Williams*, 84 F.3d at 587 (citations and quotations omitted). "When similar works resemble each other only in unprotected aspects – for example, when similarities inhere in ideas, which are by definition unprotected, or in expression that is not proprietary to plaintiff – the defendant prevails." *Gottlieb*, 590 F. Supp. 2d at 631 (granting motion to dismiss). In addition, the Second Circuit repeatedly has held that stock scenes and themes, often termed *scenes a faire*, cannot form the basis of a copyright claim. These are defined as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios*, 618 F.2d 972, 979 (2d Cir. 1980), or "thematic concepts or scenes which necessarily must follow from certain similar plot situations," *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976).

For example, in *Nobile v. Watts*, 747 F. App'x 879 (2d Cir. 2018), the Second Circuit affirmed that "the premise of 'a childless couple providentially finding a motherless baby in a boat washed up on an island and deciding to keep the baby' is an unprotectible 'idea.'" *Id.* at 881 (affirming Rule 12(b)(6) dismissal). The Court went on to affirm that the remaining similarities, including for example "finding and illicitly concealing the dead adult accompanying the baby," were unprotectible *scenes a faire* that flowed naturally from the unprotectible idea. *Id.* And in *Walker*, 784 F.2d 44, the Second Circuit affirmed summary judgment in favor of defendants where both works about Bronx police included "[e]lements such as drunks, prostitutes, vermin and derelict cars," "[f]oot chases," "the morale problems of policemen," and

13

"the Irish cop," holding those concepts to be unprotectible stock themes and *scenes a faire*. *Id.* at 50. "As such, they are not copyrightable except to the extent they are given unique – and therefore protectible – expression in an original creation." *Id.*[8]

Here, the *only* alleged similarities between Plaintiff's Videos and the Episode constitute unprotectible ideas or *scenes a faire*. *First*, and most importantly, the "premise of a service by which one can summon a homegirl to fight or otherwise take action on one's behalf, when one is unable or uncomfortable taking action on their own" – through a telephone hotline in Plaintiff's Videos and a mobile app in the Episode – is unprotectible. FAC ¶¶ 15-16, 73. Much like *Nobile*'s unprotectible idea of "a childless couple providentially finding a motherless baby in a boat washed up on an island and deciding to keep the baby," 747 F. App'x at 881, Plaintiff cannot own the idea of engaging the assistance of a "homegirl" to fight a person's battles.

Such a basic premise would not merit protection even if Plaintiff's Videos were the first to articulate the idea. But they are not the first. Indeed, this unprotectible premise has been expressed in many ways over the years, including in works that predate Plaintiff's Videos.[9]

_____

[8] *See also Abdin*, 971 F.3d at 68 (microorganism's ability to travel in space, supernatural forces, war games, and alien discovery were all unprotectible ideas and stock themes); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 672 (S.D.N.Y. 2011) (dismissing copyright claims in which both works "feature a contemporary teenage hero named after Perseus who fights battles from Greek mythology" and must "navigate the world of Greek mythology in order to solve the mystery of Zeus' missing lightning bolt," where the villains, setting, and plot develop differently), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity between short story *Rear Window* and movie *Disturbia* where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom … discovers that one of his neighbors is a murderer … is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated"); *Porto v. Guirgis*, 659 F. Supp. 2d 597, 610-14 (S.D.N.Y. 2009) (no substantial similarity in two works depicting trial of Judas Iscariot, ordered by God, to determine the fate of his soul, with testimony from Satan and other stock devices and characters).

[9] The Court may consider the existence and content of these prior works in analyzing whether Plaintiff's Videos use stock or public domain elements. First, Plaintiff has chosen to

Countless films and television series feature the concept of hiring a person to go to a certain location and intimidate and/or fight someone on the hiring party's behalf. Similar to Plaintiff's Videos, a popular fictional internet series called *The Hood Hitman*, published to YouTube more than three years before Plaintiff released her videos, offers a call service (1-800-WUS-HATN) to "anybody who don't want to get they hands dirty." And digital media studio All Def published a popular sketch to YouTube in 2015 asking viewers to call 1-800-RAYZ-HANDS to hire a person to give someone "that foot in the a\*\* that they deserve."[10]

Even the specific premise of hiring a "homegirl" is unoriginal. In a sketch broadcast on The CW television network and published to YouTube in 2016, popular MADtv character Bon Qui Qui presents a commercial for her new business venture "Homegirl Saccurity." She offers, for example, that if someone cuts off a customer in traffic, "Call me. I will track them down and I will cut them. So if you ever feel disrespected in any way and you need some protection … call Bon Qui Qui for Homegirl Saccurity."[11] These other works further confirm that the premise of engaging someone (even specifically a "homegirl") to come to a location to solve a problem is a commonly explored idea, which cannot form the basis of a valid copyright-infringement claim.

*Second*, Plaintiff alleges that while the Second Video and portions of the Episode depict a "homegirl beating someone up on behalf of the protagonist," the First Video and other portions

---

refer to and incorporate these works by reference in her FAC. FAC ¶¶ 78-79; *see DiFolco v. MSNBC Cable*, 622 F.3d 104, 111 (2d Cir. 2010) (documents referred to in complaint deemed incorporated by reference). Second, these publicly available works are subject to judicial notice. *See* Fed. R. Evid. 201; *Hord v. Jackson*, 281 F. Supp. 3d 417, 424-425 (S.D.N.Y. 2017) (dismissing case for lack of substantial similarity after finding works at issue incorporated common, public domain elements visible in works like *The Wire*, *Empire*, and *Breaking Bad*).

[10] *See* https://www.youtube.com/watch?v=fX572K8KALc; https://www.youtube.com/watch?v=u3Rx1LKGcpA.

[11] *See* https://www.youtube.com/watch?v=VlKxbwul6uk; FAC ¶ 79.

4875-4201-5250v.2 0113986-000003

of the Episode "depict variations on the same theme of violence and vengeance."  FAC ¶ 73.

Such a theme is not protectible.  Moreover, this allegation that the works "depict *variations* on

the same theme" (*id.* (emphasis added)) implicitly concedes that the works are different, not the

same, in their protectible *expression* of that theme.  Indeed, that Plaintiff alleges that *four* scenes

in the Episode simultaneously infringe *both* of Plaintiff's Videos, each of which has a different

plot and characters, confirms that Plaintiff is claiming ownership over the unprotectible idea of

engaging a "homegirl."  Copyright law does not allow her to monopolize that idea.

    *Third*, Plaintiff describes – in extremely general terms – supposed similarities in the

parties' works, but these similarities are far too general to constitute protectible expression.

Plaintiff claims that the parties' works depict "situations in which the protagonist has been

threatened or harmed," "the protagonist summoning a homegirl to fight or otherwise take

action," and "the homegirl arriving on the scene and fighting or otherwise taking action."  FAC

¶ 73.  These "broad, highly generalized descriptions" are not protectible.  *See Porto*, 659 F.

Supp. 2d at 611.  Moreover, these basic elements "flow naturally from th[e] unprotectible

premise" of hiring a homegirl to address a problem, and are therefore *scenes a faire*.  *See Nobile*,

747 F. App'x at 881.

    *Finally*, Plaintiff also alleges that characters in the parties' works say a variation of

"thank you homegirl" after the homegirl assists in the task at hand (e.g., slashing a cheating

husband's tires).  *See* FAC ¶ 73.  But thanking a service or person for assistance clearly flows

naturally from the premise of engaging a person to handle a problem.  Moreover, the phrase

"thank you, [company]" is rampant throughout commercials, infomercials, and parodies of the

same.  These stock elements and *scenes a faire* are not protectible.

C.      **The Works' Protectible Expression Is Not Substantially Similar**

"[A] determination of substantial similarity requires a detailed examination of the works themselves." *Williams*, 84 F.3d at 583 (citation and quotations omitted). Looking at the *protectible* elements in the works at issue, the question becomes the extent to which the works share "particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91. *See also Williams*, 84 F.3d at 588 (examining "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting"). In this case, the works' protectible elements, standing alone, are not similar, let alone *substantially* similar.

1.      **Plot and Sequence of Events**

Once the unprotectible premise is set aside, the works' plots are quite dissimilar. Both of Plaintiff's Videos, each one minute long, begin with a call to the HomeGirl Hotline – presented as a 911-esque dispatch service – after the caller experiences a problem. *See* Exs. B & C. In the First Video, a woman phones the hotline after learning her husband has cheated on her. The operator calms the woman down and asks her to leave the front door unlocked (as do 911 operators), then dispatches a "homegirl" first to the house to throw the husband's clothes on the lawn, and then to the husband's workplace to slash his truck's tires. Ex. B. In the Second Video, an aggrieved mother calls HomeGirl Hotline and has a homegirl dispatched to deal with a boy bullying her son. The homegirl makes the bully watch as she beats up the boy's mother. Ex. C.

In contrast, the 23-minute-long Episode covers a variety of sketches and topics, such as Conquest confronting his physical insecurities and Che attempting religious confession, that clearly are dissimilar to Plaintiff's Videos. The Sketches themselves all are rooted in the specific premise of a man hiring a "homegrrl" to directly fight another woman on the man's behalf due to social opprobrium against doing so himself, and are bookended with Che's explanations of the

17

joke (as the FAC acknowledges).  *See* FAC ¶ 38; Ex. A at 7:00, 9:15.  Plaintiff's Videos, in

contrast, have nothing to do with this premise.  Indeed, Plaintiff's Videos have the gender roles

reversed, with a woman summoning a homegirl to address a man's misbehavior.  And Plaintiffs'

Videos are not even related solely to physical fighting, as Plaintiff concedes.  *See* FAC ¶ 73.  For

example, in the First Video, the homegirl throws clothes out of a window and slashes tires; she

does not physically fight anyone.  Ex. B.  Moreover, there is no commentary or context around

the premise in Plaintiff's Videos, in contrast to the extensive commentary in the Episode.

In each of Defendants' Sketches, a man is being verbally and/or physically attacked by a

woman.  Rather than commit the social faux pas of fighting the woman himself, he uses the

"homegrrl" app to engage a woman specifically to come fight the other woman on his behalf.  In

each sketch, the "homegrrl" arrives promptly to the requestor's location and handles the physical

altercation with the problematic party.  In contrast to Plaintiff's 911-esque service, Defendants'

Sketches portray several nods to the app's rideshare and other "gig economy" inspiration – for

example, each hired homegrrl asking the man to "please rate [her] five stars," asking if the man

would like gum or water (frequent rideshare perks), and receiving a notification that a new

request was received.  *See* Ex. A at 8:40, 9:00, 13:32.  And unlike in Plaintiff's Videos where the

caller describes a problem to the operator, Defendants' Sketches fully show the incident at issue

before the man uses the homegrrl app.  Ex. A at 7:45, 8:45, 13:03.

### 2.    Characters

Plaintiff's FAC does not allege any similarities between the characters in each work

beyond that each includes a "homegirl."  Any similarity between the "homegirl" in Plaintiff's

Videos and the several "homegrrls" in Defendants' Sketches begins and ends with them being

women willing to engage in property destruction or violence on another's behalf, which is a

stock character and wholly insufficient to establish substantial similarity.  *See, e.g.*, *Hogan v. DC*

*Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) ("A stock character or basic character type, however, is not entitled to copyright protection."); *Tanksley v. Daniels*, 902 F.3d 165, 175 (3d Cir. 2018) ("[T]he share[d] premise of the shows – an African-American, male recording executive – is unprotectable.  These characters fit squarely within the class of 'prototypes' to which copyright protection has never extended.").

This Court's decision in *Vacchi* is instructive.  There, the plaintiff described a character in the defendant's commercial as an "exact match" for the plaintiff's character in various social media videos he created.  2019 WL 4392794, at *5.  The plaintiff described each character as:

> a middle-aged, male playboy, with gray/salt-and-pepper hair and beard, is heavily tattooed, wears black rim glasses, is shirtless, and is in good physical shape.  [They] share the same love of boats, dancing, partying and women (all of whom are visibly younger than the main character).

*Id.*  In rejecting the plaintiff's copyright claims, the Court found that "this description largely captures qualities shared by the [defendant's and plaintiff's] character" while "ignor[ing] … the myriad other features that distinguish the two men," only "underscore[ing] how much the character defined by [plaintiff] reflects the stock character of the older man as playboy."  *Id.* Like in *Vacchi*, any similarities between the "homegirls" in Plaintiff's Videos and Defendants' Sketches only "reflect[] the stock character," and accordingly are unprotectible.  *Id.*

Beyond that, Plaintiff's Videos and the Episode do not contain similar characters. Plaintiff's Videos focus mostly on the aggrieved caller (a distraught wife and a protective mother) and the hotline operator, all of whom appear to be played by Plaintiff.  *See* Exs. B & C. The First Video includes *no* other characters beyond the homegirl, the caller, and the operator. Ex. B.  The Second Video also includes a young bully and his mother.  Ex. C.  On the other hand, the Episode more fully fleshes out the aggressor in each of Defendants' Sketches and includes scenes with the unruly shopper (the slapper), the woman in the vehicle altercation (the

milkshake thrower), and "NoHo Karen" (the child tackler).  Ex. A at 7:47, 8:46, 13:02.  In contrast to Plaintiffs' Videos, these aggressors are women, and their victims (a grocery clerk, a driver, and a father) are men.  The aggressors, their victims, the "homegrrls," and bystanders are all played by different actors in the Sketches.  In addition, the Episode includes two prominent characters that appear throughout the Series but not in the Sketches at all: Che and Conquest. The Episode also includes Che and Conquests' friends, multiple religious leaders, the stern club bouncer, and Conquest's nurse (whose interaction with Conquest and her friend caps off the Sketches with a final callback to "homegrrl," as Conquest opens the app after seeing the nurse sharing embarrassing pictures of Conquest).  Ex. A at 1:17, 3:40, 5:44, 18:45.

   3.    **Settings**

   Plaintiff's First Video has several settings: the caller's bedroom (from which she dials the HomeGirl Hotline); the call dispatch center; the caller's lawn; and the caller's husband's workplace (where his truck tires are slashed).  Ex. B.  The Second Video likewise takes place in multiple locations: the mother's car, the dispatch center, and the bully's lawn.  Ex. C.

   On the other hand, each of Defendants' Sketches takes place entirely at one location: the man encounters the unruly woman, places his order on the "homegrrl" app, and watches the "homegrrl" handle his business all from the same spot.  And each of those spots – a supermarket, a street, and a hotel lobby – is different from the settings in Plaintiff's Videos.  Apart from the Sketches, the Episode contains a variety of other settings dissimilar to Plaintiff's Videos: a night club, various churches, a confessional booth, and a standup comedy special at Madison Square Garden, to name a few.  Ex. A.  The works' settings are very different.  *See Amanze v. Adeyemi*, 2019 WL 2866071, at *9 (S.D.N.Y. July 3, 2019) (no substantial similarity where defendant's novel was set in "a diversity" of locations, while plaintiff's novel "is mostly confined geographically" to at most two settings), *aff'd*, 824 F. App'x 86 (2d Cir. 2020).

4.      **Themes**

Plaintiff alleges that the works at issue depict "variations on the same theme of violence and vengeance." FAC ¶ 73. As explained above, a theme of "violence and vengeance" is not itself protectible. *See Edwards v. Raymond*, 22 F. Supp. 3d 293, 301 (S.D.N.Y. 2014) (Cote, J.) (theme of "a man caught up in love" not protectible). Moreover, reviewing the works emphasizes their thematic differences. Plaintiff's Videos are each approximately one minute long and appear designed to sell Plaintiff's line of "HOMEGIRL" hoodies. Exs. B & C; *see also* FAC ¶¶ 23-24, 26 (noting the hoodie "advertisement[s]" in each video). Plaintiff's Videos loosely evoke the theme of a woman engaging a service to take care of business in an anonymous way. Exs. B & C. In contrast, the Sketches lampoon social gender dynamics: that men must not physically fight women, even when the fight is initiated by the woman. This theme is explored throughout the Episode, in which Che sets up Defendants' Sketches by explaining his frustration at feeling insulted by a female bouncer without recourse, and caps things off by explaining that the concept of asking a woman, specifically a "homegirl," to fight on a man's behalf is common in society. Ex. A. The works' themes are drastically different.

5.      **Pace**

Plaintiff's Videos each are approximately one minute long, but there is no indication of how much time passes between the victim's call to HomeGirl Hotline and when the "homegirl" handles the task presented. Exs. B & C. On the other hand, the 23-minute Episode takes place over the course of at least a week (as Che's character finds himself clubbing multiple nights between Sunday church services). Ex. A. Moreover, each of Defendants' Sketches takes place in real time – the fight begins, the man requests a "homegrrl," and the "homegrrl" immediately arrives on scene. There is no similarity of pace between Plaintiff's Videos and the Episode. *See*

21

*Arden v. Columbia Pictures*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) (no substantial similarity between "slower-paced work" and "relatively fast-paced" work).

      **6.**      **Total Concept and Feel**

      The "total concept and feel" of a work refers to the way the author selected, coordinated, and arranged the elements of the work, taking into consideration similarities in "mood, details or characterization." *Reyher*, 533 F.2d at 91-92.  In comparing the works' total concept and feel, courts consider the works as a whole.  *See Jones v. CBS*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990).

      Here, the total concept and feel of the works differ sharply.  Plaintiff's Videos take the tone of a 911 call dispatch center, in which a female caller seeks help with a problem she chooses not to confront herself.  *See* Section II.A.  For example, in the First Video, the operator asks the caller for "a vehicle description and location" and confirms that she is "dispatching a homegirl right now," and the "homegirl" slashes the caller's husband's tires and tosses his clothes on the lawn.  Ex. B; *see also* Ex. C (operator confirms she is "dispatching a homegirl right now;" homegirl beats up bully's mother on caller's behalf).

      On the other hand, the Episode is an entire vignette-style television episode in which the Sketches parody infomercials for an app resembling common rideshare and other "gig economy" services – including the classic infomercial plea, "There's gotta be a better way!"  *See* Section II.B; Ex. A at 7:52.  Over the course of the Episode, like many infomercials, the Sketches cover different scenarios in which a customer might use the "homegrrl" app, all the while weaving in references to typical rideshare features.  Lastly, the Sketches focus on, and do not deviate from, the Episode's theme of men hiring women to fight their battles with other women because they are prevented by threat of "cancellation" from fighting women themselves.  Each work's total concept and feel is drastically different, and cannot sustain a copyright-infringement claim.

4875-4201-5250v.2 0113986-000003

## V.    PLAINTIFF'S SECONDARY LIABILITY CLAIMS FAIL

Because Plaintiff has not plausibly alleged a claim of direct copyright infringement, her claims of contributory and vicarious copyright infringement also fail.  *See Williams v. A&E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) ("[T]here can be no contributory infringement absent actual infringement, and no vicarious infringement absent direct infringement.") (citing *Faulkner v. Nat'l Geographic Enters.*, 409 F. 3d 26, 40 (2d Cir. 2005)).

Even if Plaintiff's underlying infringement claims were sufficiently pled to support direct infringement (they are not), her secondary infringement claims fail for several additional reasons.

### A.    Plaintiff Fails to Adequately Plead Contributory or Vicarious Infringement

Plaintiff fails to plausibly allege the required elements of contributory and vicarious infringement, whether as to the purported infringement by HBO Max subscribers or by unspecified "Technology Partners."  For contributory infringement, Plaintiff must show that Defendants "induce[d], cause[d] or materially contribute[d] to the infringing conduct of another."  *Hartmann v. Amazon.com, Inc.*, 2021 WL 3683510, at *6 (S.D.N.Y. Aug. 19, 2021) (citation omitted).  Plaintiff alleges no facts supporting this element of contributory liability, instead parroting conclusory statements that are plainly insufficient.  *See* FAC ¶ 100 ("Defendants enable, induce, facilitate, and materially contribute to each act of infringement by the HBO Max subscribers."), *id.* ¶ 129 ("Defendants enable, induce, facilitate, and materially contribute to each act of infringement by the Technology Partners.").

As to vicarious infringement, Plaintiff must show that Defendants "ha[ve] the right and ability to supervise the [third party's] infringing activity."  *Hartmann*, 2021 WL 3683510, at *9 (citation omitted).  Plaintiff again merely parrots the conclusory statements that "Defendants have both the right and the ability to supervise the HBO Max subscribers' [and the Technology Partners'] infringing conduct, and to prevent them from infringing upon Manno's copyrighted

Works" (FAC ¶¶ 115, 144), without alleging any factual foundation as to *how* Defendants supervise or prevent subscribers' infringement, who the "Technology Partners" are or how Defendants supervise them, or which of the eight named Defendants have this purported supervisory power.  Plaintiff's "formulaic recitation of the elements" is inadequate.  *Hartmann*, 2021 WL 3683510, at *9 (rejecting plaintiff's vicarious infringement allegations where plaintiff did "no more than recite [the] elements in a conclusory manner").

**B.      Plaintiff's "Public Performance" Theory Is Untenable**

Plaintiff also alleges that HBO Max subscribers "direct[ed] the service to publicly perform the Episode" and thereby "directly infring[ed]" Plaintiff's copyright, for which Plaintiff seeks to hold Defendants secondarily liable.  FAC ¶¶ 98-99, 112-13.  This theory turns public performance on its head.  The subscribers are not directing a public performance because each individual subscriber is directing a *private* performance to themself.  *See Am. Broad. Cos. v. Aereo*, 573 U.S. 431, 450 (2014) (public performance requires "transmi[ssion] to a substantial number of people outside of a family and its social circle").  Because those subscribers did not directly infringe, Defendants cannot be secondarily liable for their conduct.

## VI.      CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss this lawsuit with prejudice.  *See Hord*, 281 F. Supp. 3d at 428 (dismissing complaint with prejudice due to lack of substantial similarity).[12]

---

[12] After Defendants' first motion to dismiss, Plaintiff exercised her right to amend her complaint but was specifically warned by the Court that "[i]t is unlikely that plaintiff will have a further opportunity to amend."  Dkt. 17 at 1.  Plaintiff has had ample opportunity to plead and replead her claims, and there is no basis to afford Plaintiff the ability to file a fourth futile pleading on the same claims.  *See Ludlow Essex Partners v. Wells Fargo Bank*, 2017 WL 2963488, at *3 (S.D.N.Y. July 11, 2017) (Cote, J.) (denying leave to amend where "plaintiffs

Dated: March 25, 2022                    Respectfully submitted,

                                         DAVIS WRIGHT TREMAINE LLP

                                         By: /s/ Cydney Swofford Freeman
                                         Nicolas A. Jampol (*pro hac vice* pending)
                                         Cydney Swofford Freeman
                                         Joel Richert (*pro hac vice* pending)
                                         868 S. Figueroa Street, Suite 2400
                                         Los Angeles, CA 90017
                                         (213) 633-6800 Phone
                                         (213) 633-6899 Fax
                                         nicolasjampol@dwt.com
                                         cydneyfreeman@dwt.com
                                         joelrichert@dwt.com

                                         Raphael Holoszyc-Pimentel
                                         1251 Avenue of the Americas, 21st Floor
                                         New York, NY 10020
                                         (212) 489-8230 Phone
                                         (212) 489-8340 Fax
                                         rhp@dwt.com

                                         *Attorneys for Defendants*

---

have already been afforded an opportunity to amend their complaint, and were warned that it would likely be their final opportunity").