UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

KELLY MANNO,

                              Plaintiff,                    Index No. 21-cv-10642-DLC

     - against-

MICHAEL CHE CAMPBELL p/k/a MICHAEL CHE,
REGGIE CONQUEST, UNIVERSAL TELEVISION
LLC, NBCUNIVERSAL MEDIA, LLC, THE
BROADWAY VIDEO GROUP, INC., LEATHER SUIT,
INC., IRONY POINT, LLC, WARNERMEDIA, LLC
d/b/a HBO MAX, and DOES 1-10;

                              Defendants.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

PARNESS LAW FIRM, PLLC
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
212-447-5299
hip@hiplaw.com
*Attorneys for Plaintiff Kelly Manno*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL SUMMARY ......................................................................................................... 3

ARGUMENT .......................................................................................................................... 6

I.      Motion to Dismiss Standard ......................................................................................... 6

II.    The Amended Complaint Sufficiently Alleges that Defendants Engaged in Copyright Infringement ................................................................................................. 7

       A.     The Amended Complaint Sufficiently Alleges that Defendants Had Access to Plaintiff's Videos ......................................................................... 7

       B.     The Amended Complaint Sufficiently Alleges that Defendants' Segments are Substantially Similar to Plaintiff's Videos ......................................... 13

       C.     The Amended Complaint Sufficiently Alleges Claims Against Defendants of Contributory and Vicarious Copyright Infringement ............................................. 17

              1.   The Complaint Pleads Contributory and Vicarious Copyright Infringement Arising from Subscribers ................................................... 19

              2.   The Complaint Pleads Contributory and Vicarious Copyright Infringement Arising from Defendants' Technology Partners ...................................... 23

       D.    Defendants Have No Basis to Seek Attorney's Fees ........................................... 25

CONCLUSION ....................................................................................................................... 25

i

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) ......................................... 19, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 6

*Batts v. Adams*, CV 10-8123-JFW (RZX), 2011 WL 13217923 (C.D. Cal. Feb. 8, 2011) ........... 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 6

*Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154 (S.D.N.Y. 2017) .............................................. 15

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ................. 20, 23

*Castro v. Cusack*, 15-CV-6714-ENV-LB, 2019 WL 3385218 (E.D.N.Y. July 26, 2019) ........... 10

*Chirogianis v. Parangi*, 11-CV-953, 2011 WL 6179706 (S.D.N.Y. Dec. 12, 2011) ................... 15

*Clanton v. UMG Recordings, Inc.*, 20-CV-5841-LJL, 2021 WL 3621784 (S.D.N.Y. Aug. 16, 2021) .......................................................................................................................................... 8

*David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752 (S.D.N.Y. 1988) ...................... 21

*De Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944), *cert. denied*, *Hearst Magazines v. De Acosta*, 325 U.S. 862 (1945) .................................................................................................................. 18

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) .................................................... 6

*Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir. 1929) .............. 18

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir.1988) ........................................................................ 9

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) ............... 18

*Griffin v. Sheeran*, 351 F. Supp. 3d 492 (S.D.N.Y. 2019) ........................................................... 13

*Hines v. W Chappell Music Corp.*, 20-CV-3535-JPO, 2021 WL 2333621 (S.D.N.Y. June 8, 2021) ........................................................................................................................................ 13

*In re Cellco P'ship*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009) .......................................................... 18

*Kelly Tracht, LLC v. Dazzle Up, LLC*, 17-80434-CIV-MARRA, 2017 WL 4681329 (S.D. Fla. Oct. 18, 2017) .......................................................................................................................... 12

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) .............................................................. 6

*Loomis v. Cornish*, 836 F.3d 991 (9th Cir. 2016) .......................................................... 8

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ............................. 6

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ................ 18

*Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429 (S.D.N.Y.2011)), *aff'd on other grounds*, 555 F. App'x 31 (2d Cir. 2014) ................................................................. 10

*Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000) ................... 21

*NYC Image Int'l, Inc. v. RS USA, Inc.*, 19-CV-10355-VSB, 2020 WL 6135763 (S.D.N.Y. Oct. 16, 2020) .............................................................................................................. 15

*OMG Accessories LLC v. Mystic Apparel LLC*, 19-CV-11589-ALC-RWL, 2021 WL 1167528 (S.D.N.Y. Mar. 25, 2021) ................................................................................. 15

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010)..... 13, 15, 16

*Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ................ 18

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir.), *cert. denied sub nom.*, 141 S. Ct. 453 (2020), *reh'g denied*, 141 S. Ct. 946 (2020) .......... 8

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..................... 18

*Tee Turtle, LLC v. Anhui Leadershow Household Industrial Co., Ltd.*, CV 21-4703-CBM-(Ex), 2021 WL 4815018 (C.D. Cal. Jun. 17, 2021).......................................................... 12

*Vacchi v. E*TRADE Fin. Corp.*, 19-CV-3505-DLC, 2019 WL 4392794 (S.D.N.Y. Sept. 13, 2019) ............................................................................................. 12, 13, 14, 17

*Wager v. Littell*, 549 F. App'x 32 (2d Cir. 2014) .................................................. 9, 15

*Webb v. Stallone*, 910 F. Supp. 2d 681 (S.D.N.Y. 2012)......................................... 9, 10

**Statutes**

17 U.S.C. § 505.................................................................................................... 25

Fed. R. Civ. P. 12(b)(6)............................................................................................. 6

**Other Authorities**

4 Nimmer on Copyright § 13D.05[B][1] ..................................................................... 7

4 Nimmer on Copyright § 13D.05[D][2] ................................................................. 7, 8, 13

Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything Is About to Change.*, N.Y. Times, Nov. 18, 2019 ................................................................................................. 8

## PRELIMINARY STATEMENT

Plaintiff Kelly Manno ("Plaintiff" or "Manno") submits this Memorandum of Law in opposition to the motion by Defendants Michael Che Campbell p/k/a Michael Che, Reggie Conquest, Universal Television LLC, NBCUniversal Media, LLC, The Broadway Video Group, Inc., Leather Suit, Inc., Irony Point, LLC and WarnerMedia, LLC d/b/a HBO Max (collectively, "Defendants") to dismiss Plaintiff's Amended Complaint (ECF 18) for willful direct, contributory and vicarious copyright infringement.[1]

Plaintiff – the creator of two "HomeGirl Hotline" short-form comedy videos that were posted to major streaming services TikTok, Instagram and Facebook – has brought copyright claims against the Defendants for their respective roles in connection with the creation, reproduction and dissemination of four "homegrrl" short-form segments that appeared in an episode of *That Damn Michael Che* on the HBO Max subscription streaming service.

The central thrust of Defendants' motion concerns the question of access, with Defendants arguing that because Plaintiff does not have evidence that Defendants actually accessed her videos on the publicly-available streaming platforms, all of her claims of copyright infringement must be dismissed as a matter of law.  That is not the law, with good reason.  Were it the law, it would bar all copyright claims except those rare instances in which, for whatever reason, the plaintiff has access pre-suit to documentary evidence of defendant's pre-suit behavior (for example, if an employee infringes his employer's copyrights using the employer's own

---

[1] Plaintiff holds two copyright registrations – PA2308699 (effective May 13, 2021) and PA2315509 (effective Sept. 12, 2021).  Plaintiff voluntarily dismissed the predecessor case – *Manno v. Campbell*, 21-cv-7666-PAE-KNF (filed Sept. 14, 2021 S.D.N.Y.) – because Defendants pledged to fight any effort to amend that complaint to reflect the issuance of the second registration, even though it was issued with an effective date that preceded the date the complaint was filed.

systems) or where the infringer admits to copying (for example, if an artist admittedly uses a photographer's work as the basis for his "appropriation art").  Rather, in all cases where access is not undisputed or pre-established, courts find plaintiffs to have pled access through circumstantial evidence.  The allegations in the Amended Complaint, which are assumed to be true for purposes of this Rule 12(b)(6) motion, more than satisfy the standards defined by prior precedent, and for that reason the access arguments should be rejected.

Defendants' second argument is that the two sets of short-form videos are not – <u>as a matter of law</u> – substantially similar.  Although making such a determination is certainly within this Court's purview, the allegations in the Amended Complaint (and a review of the videos) more than adequately demonstrate the commonalities.  Although Defendants would like to paint the dispute as one over the rights to the idea of a homegirl, or the idea of hiring a hit man, that is not the case.  Plaintiff's videos brought forth the unique creative comedic depiction of a service through which a customer in need specifically summons a homegirl to fight one's battles, and the videos structure that expression around a depiction of the act of calling for the homegirl, and the homegirl arriving and proceeding to inflict violence or damage as a surrogate upon the target. Defendants' four segments all depict the same thing, the only variations being the specific gripe on the part of the customer and the manner in which the violence or damage is inflicted, with the only major variation being that Plaintiff's videos depict a telephone dial-up hotline, and Defendants' replace it with an automated telephone "app."  Defendants fail to demonstrate that Plaintiff's videos are unprotectable *scènes à faire*, and the three examples they cite do not live up to their hype, instead highlighting the unique expression of Plaintiff's videos that is reproduced in Defendants'.

Finally, Defendants' motion to dismiss the claims for contributory and vicarious liability should also be dismissed (assuming of course that the Court finds that a claim for direct infringement has been pled sufficiently), as each of the secondary liability claims plausibly allege each of the elements of these well-established tests.  Two of the claims are premised upon the fact that instances of infringement occur when Defendants' subscription customers download or stream the allegedly infringing episode of the show, and two are premised upon the fact that when Defendants distribute the allegedly infringing episode of the show they do so through technology partners who self-evidently engage in additional instances of infringement.

### FACTUAL SUMMARY

Plaintiff assumes the Court's familiarity with the facts alleged in the Amended Complaint, and also encourages the Court to view Plaintiff's videos and Defendants' video, which have been provided to the Court by Defendants in the form of a DVD and Internet links. ECF 25.  Because we expect the Court will be viewing the parties' videos, we do not presume to substitute Plaintiff's description of the videos for the Court's own perception, but we do set forth below relevant allegations from the Amended Complaint.

Manno is a popular Internet content creator, with (as of September 12, 2021) 1.3 million followers on TikTok, 25,700 followers on Instagram and 4,900 followers on Facebook.  Manno reached 1 million TikTok followers on October 8, 2020, approximately one month after she posted the second of the two Works, and over seven months before the premiere of the infringing program – *That Damn Michael Che* – on the HBO Max streaming service.  ECF 18 ¶ 19. Plaintiff and her videos have been featured on numerous websites listing "top" TikTok content providers, and were even highlighted on the popular syndicated "Access Hollywood" television program, with host Mario Lopez showing a clip of one of her videos and talking about her 1.2 million TikTok followers.  *Id*. ¶ 20.

3

Manno posted the first of her videos on or about August 9, 2020 on TikTok, Instagram and Facebook, where it was publicly available for viewing.  On TikTok alone (as of September 12, 2021)[2] it had been viewed 246,800 times, received 57,700 "likes" and 960 comments, and had been forwarded 3,406 times.  *Id.* ¶ 28.[3]  Manno posted the second of her videos on or about September 4, 2020 to the same three video services, also making it publicly available.  On TikTok alone (as of September 12, 2021) it had been viewed 580,600 times, received 122,600 "likes" and 1,969 comments, and had been forwarded 8,364 times.  *Id.* ¶ 29.  Most – if not all – of the Defendants maintain active presences on the same publicly-available social media sites as Plaintiff, which Plaintiff maintains would increase the likelihood of Defendants encountering Plaintiff's videos.  *Id.* ¶¶ 66-71.

Defendants are the creators, producers and broadcasters of *That Damn Michael Che*, which is available for streaming and downloading on the HBO Max subscription service, and which debuted on or about April 16, 2021.  *Id.* ¶ 30.  Episode Six of that program includes four segments regarding "homegrrl," a fictional service by which people can summon a homegirl through a mobile app. The four homegrrl segments comprise 3 minutes, 2 seconds in duration, approximately 13.6% of the duration of all of the content in the episode. The entire episode, however, is structured in significant part around these segments, so that other parts of the episode that are not directly about homegrrl itself nevertheless reinforce the homegrrl segments.  *Id.* ¶ 31.

---

[2] The statistics for Plaintiff's videos on the other social media sites are set forth in the Amended Complaint.  ECF 18 ¶¶ 28-29.

[3] As we expect the Court already understands, when one forwards or shares a video on social media (as was the case with each of Plaintiff's videos, each of which was shared thousands of times), each of the people to whom the video was forwarded has his or her own set of followers, and the forwarded video can then be "liked," commented upon and forwarded still further, further expanding the distribution of the video and the reasonable opportunity for access.

Plaintiff alleges – but concedes at this time it has no direct proof – that one or more of the Defendants, including but not limited to their employees, consultants, associates, agents and affiliates, saw one or both of Plaintiff's videos prior to Defendants' release of *That Damn Michael Che* in April 2021. *Id*. ¶ 47.  Plaintiff further alleges – but concedes at this time that she has no direct proof – that one or more of the Defendants, including but not limited to their employees, consultants, associates, agents and affiliates, then copied one or both of the videos in the process of creating *That Damn Michael Che.  Id*. ¶ 56.  Plaintiff also alleges that Defendants, in creating *That Damn Michael Che*, knowingly copied her videos in a manner that is substantially similar, if not strikingly similar.  *Id*. ¶¶ 57, 72-73, 83-84.

In Plaintiff's view, the similarities between her videos and the Defendants' program include the following.  As noted above, Plaintiff does not seek to substitute her observational powers for those of the Court if the Court is inclined to watch the parties' respective works:

- Both are based on the comic premise of a service by which one can summon a homegirl to fight or otherwise take action on one's behalf, when one is unable or uncomfortable taking action on their own.

- Both begin with situations in which the protagonist has been threatened or harmed, and needs to find a homegirl to fight or otherwise take action on their behalf.

- Both have the protagonist summoning a homegirl to fight or otherwise take action on their behalf.

- Both have the homegirl arriving on the scene and fighting or otherwise taking action on behalf of the protagonist.

- Plaintiff's second video and two of the four segments of Defendants' program both depict the homegirl beating someone up on behalf of the protagonist.

- Plaintiff's first video and the remaining segments of Defendants' program depict variations on the same theme of violence and vengeance. In Plaintiff's first video, the homegirl throws clothes out a window and slashes tires, and in the second homegrrl segment the homegirl chases someone away but is not shown actually beating anyone up. In the fourth homegrrl segment the scene

ends before the arrival of the homegirl, leaving the audience without a clear picture of what the homegirl is going to do when she arrives.

- Plaintiff's first video and Defendants' program are both punctuated with the protagonist expressing a variation of the phrase "Thank you Homegirl Hotline" and "Thank you Homegrrl," respectively. Three of Defendants' four homegrrl segments include that phrase, and the fourth segment ends before the homegirl arrives, leaving no opportunity for the protagonist to thank her.

## **ARGUMENT**

### I.    **Motion to Dismiss Standard**

In considering a motion to dismiss, all allegations in the complaint are taken as true, construed in the light most favorable to the plaintiff, and judged for "facial plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). The movants bear the burden of demonstrating that the complaint fails to state a claim upon which relief may be granted. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). To survive the motion, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" (*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)), but in the normal course is discouraged from going further.

6

II.     **The Amended Complaint Sufficiently Alleges that Defendants Engaged in
        Copyright Infringement**

        A.      **The Amended Complaint Sufficiently Alleges that Defendants Had
                Access to Plaintiff's Videos**

As Professor Nimmer explains, the access prong of the copying element of the test for

copyright infringement does not require proof of actual access, but rather the "reasonable

opportunity" of access:

> It is axiomatic that, in order to have appropriated expression from a protected
> work, defendant first must have had access to it. All the same, access does not
> mean that defendant actually viewed the copyrighted work while composing the
> putatively infringing product. Instead, proof of access suffices when plaintiff is
> able to show that defendant had a reasonable opportunity to view (or otherwise
> experience) the protected work. That reasonable opportunity to view itself
> constitutes access….
>
> Proof of access plus probative similarity is designed to protect plaintiffs and
> defendants alike. By not requiring actual viewing but only the opportunity to
> view, plaintiffs are benefitted by being spared impossible burdens of proof; by
> allowing dismissal of cases when there was no reasonable opportunity for
> defendant to view the work, defendants are benefitted by being spared limitless
> strike suits.

4 Nimmer on Copyright §§ 13D.05[B][1] & [D][2].  Indeed, Professor Nimmer is very critical of

courts that have – in the past – strayed from this formulation:

> Nonetheless, some courts have adopted that erroneous position requiring actual
> viewing. *See Bradbury v. Columbia Broadcasting Sys., Inc*., 287 F.2d 478 (9th
> Cir. 1961), *cert. dismissed*, 368 U.S. 801 (1961); *Cantor v. Mankiewicz*, 203
> N.Y.S.2d 626 (Sup. Ct. N.Y. County 1960); *Schwarz v. Universal Pictures Co*.,
> 85 F. Supp. 270 (S.D. Cal. 1945); *Christie v. Harris*, 47 F. Supp. 39 (S.D.N.Y.
> 1942), *aff'd*, 154 F.2d 827 (2d Cir. 1946), *cert. denied*, 329 U.S. 734 (1946).

*Id*. § [B][1] n. 6.

> Plaintiff had made the plans available on the Internet as part of its ongoing
> professional business and defendant admitted to looking at house plans online.
> Moreover, defendant could not adequately explain how the architectural firm that
> it hired received a copy of the plans on which it based the allegedly infringing
> design. Nonetheless, the Fourth Circuit denied that a reasonable possibility of
> access existed. It is submitted that this holding flies in the face of the evidence
> just recited.  Requiring proof of an actual visit vitiates the essence of access.

*Id*. § [D][2] & n. 139.

In this case, Plaintiff alleges Defendants had access based on the availability and

popularity of Plaintiff and the wide dissemination of her videos on multiple streaming platforms,

as well as Defendants' active presence on those same platforms.  In the well-known *Skidmore*

"Stairway to Heaven" case, the Ninth Circuit observed:

> As a practical matter, the concept of "access" is increasingly diluted in our digitally interconnected world. Access is often proved by the wide dissemination of the copyrighted work. *See Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). <u>Given the ubiquity of ways to access media online, from YouTube to subscription services like Netflix and Spotify, access may be established by a trivial showing that the work is available on demand</u>. *See* Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything Is About to Change.*, N.Y. Times, Nov. 18, 2019 (In addition to Netflix, which "entertain[s] more than 158 million subscribers worldwide," there are currently "271 online video services available in the United States").

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1068 (9th Cir.)

(emphasis added), *cert. denied sub nom.*, 141 S. Ct. 453, 208 L. Ed. 2d 145 (2020), *reh'g denied*,

141 S. Ct. 946, 208 L. Ed. 2d 482 (2020).

In *Clanton v. UMG Recordings, Inc.*, 20-CV-5841-LJL, 2021 WL 3621784 (S.D.N.Y.

Aug. 16, 2021) – one of the cases cited by Defendants – the court granted a motion to dismiss

upon a finding that plaintiff had failed to allege access, because plaintiff provided no details that

would allow the court to find reasonable opportunity for access:

> Plaintiff alleges no facts supporting his argument that the Subject Composition was widely disseminated beyond the <u>bare facts that it was on a mixtape that was posted to several hip-hop websites</u> and that the Subject Composition was posted on YouTube, and the <u>vague and conclusory claim</u> that the Subject Composition "has been widely shared and listened to online and on social media."….Plaintiff has made no specific allegations about how many times the song was accessed on YouTube or on the specialty hip-hop websites to which the Mixtape was uploaded <u>or the general time periods</u> during which it was accessed.

*Id*. \*3 (emphasis added).

*Batts v. Adams*, CV 10-8123-JFW (RZX), 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8,

2011) – cited by Defendants for its "needle in a haystack" analogy – does <u>not</u> support their

position.  In that case (which involved a motion for preliminary injunction, not a motion to

dismiss), all that plaintiff had shown the court was that the allegedly infringed video was "posted

on YouTube, Amazon.com, and iTunes in approximately early January 2008."

Likewise, in *Wager v. Littell*, 549 F. App'x 32 (2d Cir. 2014) – another case cited by

Defendants – the Second Circuit found a dearth of connective tissue in the allegations, and

finding that the district court had properly declined to find an allegation of access:

> Like the district court, we conclude that Wager failed plausibly to plead such a
> reasonable possibility of defendants' access to the Dharien work. Insofar as
> Wager alleges that Dharien loaned his manuscript to "Paul," "Jacques," and
> "April," three persons who are not further identified, she pleads <u>no contacts or
> connections</u> between these persons and defendants. Meanwhile, her allegation that
> Littell may have seen Dharien's manuscript when the men lived at some distance
> from each other in Spain because Dharien <u>frequently traveled to various cities to
> meet local writers</u> is too speculative plausibly to state a reasonable opportunity to
> view. Similarly speculative, and therefore inadequate, is Wager's allegation that,
> because Dharien's manuscript was stored on-line, defendants <u>could have gained
> access by hacking</u> his account.

*Id*. at 33-34 (emphasis added) (*citing Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988)).

*Webb v. Stallone*, 910 F. Supp. 2d 681, 686-87 (S.D.N.Y. 2012) – yet another inapposite

case cited by Defendants – provides a model of how to fail to satisfy the access prong, notably in

the context of a motion for summary judgment, not a motion to dismiss:

> Plaintiff's circumstantial affirmative evidence of access is weak, to say the least.
> Webb, who is not a professional screenwriter, and has no previous screenwriting
> credits to his name, submitted Cordoba to eight "well-known" screenwriting
> competitions, which purportedly pride themselves on discovering new material
> and employ staff and judges with contacts in the movie industry….it would
> require almost endless speculation to explain how Webb's submission of Cordoba
> to amateur screenplay competitions ended up in front of Stallone. Indeed, <u>even
> after full discovery</u>, plaintiff submits no evidence whether anyone who worked for
> Stallone – or even anyone who worked at the companies who worked for Stallone
> – participated in or had connections to any of these screenwriting competitions. In

the absence of this or other evidence presenting a reasonable possibility that Stallone viewed Cordoba, as opposed to mere speculation or conjecture, plaintiff has failed to raise a genuine issue of material fact on access.

*Webb v. Stallone*, 910 F. Supp. 2d 681, 686-87 (S.D.N.Y. 2012) (emphasis added) (*citing Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 439 (S.D.N.Y.2011)), *aff'd on other grounds*, 555 F. App'x 31 (2d Cir. 2014).

A similar decision from the Eastern District of New York found that "[Plaintiff] Castro simply cannot connect the dots," explaining, colorfully: "Castro's theory relies on wholesale speculation that, like a regifted Christmas fruitcake, the manuscript found its way from John Cusack's agency to an array of actors, talent agencies and production companies. Such bald assertions are not sufficient to plausibly allege access." *Castro v. Cusack*, 15-CV-6714-ENV-LB, 2019 WL 3385218, at *7 (E.D.N.Y. July 26, 2019).

Here – in stark contrast to all of the foregoing cases – Plaintiff includes specific allegations of: (i) her popularity as a creator, measured by number of followers and her being featured on television; (ii) the wide dissemination of her videos, measured by numbers of views; and (iii) the active presence of the Defendants on the same social media platforms on which her videos were posted.  Defendants try to argue that the viewing and follower data is irrelevant, but they are wrong.[4]  It should be obvious to all that Plaintiff did not know in advance that Defendants would infringe on her videos some eight months after she posted the first of her videos, and thus there is no reason to expect Plaintiff to have kept precise statistics of her views

---

[4] Alternatively, if Defendants are arguing that Plaintiff did not allege that her videos were widely disseminated before April 2021, the Amended Complaint shows otherwise.  ECF 18 ¶¶ 19, 47, 56, 64 (specifically explaining the basis for her allegations of pre-infringement dissemination and access).  For reasons discussed herein, Plaintiff cannot allege specific views as of April 2021 as she will not have access to that information until she can send out discovery, and she should not be faulted for that.

and followers at the moment of infringement.  Any information Plaintiff currently has is based

on publicly-available information and some serendipity.

To that end, Plaintiff alleges all of the following, going to her popularity as a creator and

source of humorous videos:

- Manno reached the million-follower mark on TikTok in October 2020, <u>seven months before</u> the infringing episode aired in April 2021.  ECF 18 ¶ 19.

- As of September 12, 2021 (after the infringement), Manno had 1.3 million followers on TikTok, 25,700 followers on Instagram and 4,900 followers on Facebook.  *Id*.  Although this was five months <u>after</u> the infringing episode aired, it stands to reason that Manno had between 1 million and 1.3 million followers in the seven months leading up to the airing of the episode.

- Consistent with that conclusion, Plaintiff and her videos were featured on the "Access Hollywood" television program in or about May 2021 – just a month after the episode aired – and the host referenced Plaintiff's then-1.2 million followers.  *Id*. ¶ 20.[5]

Plaintiff further alleges the number of views of the videos based on the information

currently available to her:

- As of September 12, 2021, on the TikTok platform, the first video had been viewed 246,800 times, received 57,700 "likes" and 960 comments, and had been forwarded 3,406 times.  *Id*. ¶ 28.

- Also as of September 12, 2021, and also on TikTok, the second video had been viewed 580,600 times, received 122,600 "likes" and 1,969 comments, and had been forwarded 8,364 times.  *Id*. ¶ 29.

Plaintiff does not dispute that September 2021 is five months after April 2021, but, as

noted above, Plaintiff did not anticipate that Defendants were going to infringe upon her videos,

and these are the statistics available to Plaintiff without serving third-party discovery upon the

social media services.  That will certainly happen once issue is joined in the case, but it is unfair

---

[5] Defendants point out in their brief that the "Access Hollywood" episode aired on or about Mother's Day 2021.  ECF 23 at 10 n.5.

to blame Plaintiff for lacking the information now.  Indeed, Plaintiff fully expects to seek

information from the social media platforms not just relating to her own activity and statistics,

but for any and all information that can be used to tie Defendants to her accounts and her videos.

Defendants' suggestion that there is no correlation on social media sites between followers and

viewers defies common sense and the allegations already before the Court, and Plaintiff expects

discovery to further bear out that obvious relationship.

 Number of views is a well-established method of substantiating the reasonable

opportunity for access.  *See Tee Turtle, LLC v. Anhui Leadershow Household Industrial Co.,*

*Ltd*., CV 21-4703-CBM-(Ex), 2021 WL 4815018 (C.D. Cal. Jun. 17, 2021) (finding allegations

of millions of views of videos featuring stuffed animal products sufficient to satisfy likelihood of

success with respect to access).[6]  In addition to number of views, courts also take note of the

number of followers as an indicator of dissemination and therefore access.  *See Kelly Tracht,*

*LLC v. Dazzle Up, LLC*, 17-80434-CIV-MARRA, 2017 WL 4681329, *3 (S.D. Fla. Oct. 18,

2017) (denying motion to dismiss where "Amended Complaint states that Plaintiff has marketed

and sold twenty different expressions of the turtle images on Etsy since 2012, which has resulted

in 888 sales and 1,571 admirers who follow the page.  Plaintiff also uses other social media and

third-party sites....") (emphasis added).[7]

---

[6] In *Tee Turtle*, the alleged infringement was of the products, not the videos, but the court's acceptance of the numbers of views of the videos as proof of access to the products is even more attenuated than using view numbers as proof of access to the videos themselves.

[7] In *Vacchi v. E*TRADE Fin. Corp*., 19-CV-3505-DLC, 2019 WL 4392794, at *1 (S.D.N.Y. Sept. 13, 2019) – cited by Defendants to support their argument concerning substantial similarity – this Court noted at the outset that "Vacchi also has a significant social media presence. More than 11.9 million people follow Vacchi's Instagram page, and more than 1.77 million people follow his Facebook page. He uses Instagram and Facebook as platforms upon which to post videos, pictures, and musical clips that he produces."  Perhaps that is why, in that case, "E*Trade [did] not dispute that it had access to the Registered Videos."  *Id*. at *3.

Plaintiff freely admits her lack of actual proof that Mr. Che, Mr. Conquest, or any of the myriad other individuals who worked on the episode <u>actually</u> accessed the videos, but dismissing the case for that lack of that proof evidence would – in Professor's Nimmer's words – place an "impossible burdens of proof" on Plaintiff and "vitiate[] the essence of access." Rather, once Plaintiff alleges <u>reasonable opportunity</u> for access, Plaintiff should be allowed to proceed with discovery to support her entirely plausible claims.

### B.    The Amended Complaint Sufficiently Alleges that Defendants' Segments are Substantially Similar to Plaintiff's Videos

"Although a district court may resolve the question of substantial similarity 'as a matter of law on a Rule 12(b)(6) motion to dismiss,'" we respectfully submit that the Court should not do so here "'without the aid of discovery or expert testimony.'" *Hines v. W Chappell Music Corp.*, 20-CV-3535-JPO, 2021 WL 2333621, at *3 (S.D.N.Y. June 8, 2021) (*quoting Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 65 (2d Cir. 2010)) (denying motion to dismiss). Indeed, even at the summary judgment stage, after discovery, courts are often hesitant to make determinations as to substantial similarity. *Griffin v. Sheeran*, 351 F. Supp. 3d 492, 496 (S.D.N.Y. 2019) ("Courts may determine non-infringement of a copyright as a matter of law on a motion for summary judgment, although 'the issue of substantial similarity is frequently a fact issue for jury resolution.'") (*quoting Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 239-40 (2d Cir. 1983)).

Defendants repeatedly direct the Court to its prior decision in *Vacchi v. E\*TRADE Fin. Corp.*, 19-CV-3505-DLC, 2019 WL 4392794, at *4 (S.D.N.Y. Sept. 13, 2019), calling it "instructive." ECF 23 at 19. Plaintiff agrees. *Vacchi* is indeed instructive, but because it highlights the differences between the two cases. In *Vacchi*, the Court began by observing that the two sets of videos at issue were not at all similar, even on a high level:

> The E*Trade commercial Yacht Life is not substantially similar to the Registered Videos. Yacht Life is focused on "the dumbest guy in high school," who recently purchased a yacht. He is seen dancing throughout the boat, either alone or in a group of people, who are primarily peers his own age. The subject of the Registered Videos, by contrast, is an older man, Vacchi's character. In two videos, he acts as a DJ at a dance party aboard a boat. In three videos, he performs a choreographed dance with a younger woman. The Registered Videos are character-driven works that focus on a character with no similarities to the main subject of Yacht Life. There is thus no basis for finding substantial similarity between this commercial and the Registered Videos.

*Vacchi v. E*TRADE Fin. Corp.*, 19-CV-3505-DLC, 2019 WL 4392794, at *4 (S.D.N.Y. Sept. 13, 2019).  The Court was focused on the plot and central character in each work, finding them to have "no similarities."

Plaintiff's and Defendants' videos, by contrast, are very similar from the outset – both depict a homegirl-ordering service, and structure the presentation of the service in an order-and-arrival structure.  Moreover, there are undeniable similarities between the homegirl character depicted in Plaintiff's "Homegirl Hotline" videos (on the left), and the homegirl character Defendants chose to use in their first, establishing "Homegrrl" skit (on the right):

 

14

Other cases provide much closer analogues, where the similarities were apparent, but where there were defense arguments going to public domain, *scènes à faire* and selection and arrangement of otherwise unprotectable elements.  *See*, *e.g.*, *OMG Accessories LLC v. Mystic Apparel LLC*, 19-CV-11589-ALC-RWL, 2021 WL 1167528, at *3 (S.D.N.Y. Mar. 25, 2021) (finding commonalities between two depictions of unicorns made it "premature to decide, at this stage, that 'no reasonable jury, properly instructed, could find that the two works are substantially similar' based on their 'total concept and overall feel'") (*quoting Gaito*, 602 F.3d at 63); *NYC Image Int'l, Inc. v. RS USA, Inc*., 19-CV-10355-VSB, 2020 WL 6135763, at *5 (S.D.N.Y. Oct. 16, 2020) (finding similarities in "distinguishable variation of the American flag" and allegedly infringing depiction made it so that the Court "cannot conclude as a matter of law that "'no reasonable jury ... could find that the two works' are strikingly similar") (*quoting Wager*, 549 F. at 34 (*quoting Gaito*, 602 F.3d at 63-64)); *Chirogianis v. Parangi*, 11-CV-953, 2011 WL 6179706, at *3 (S.D.N.Y. Dec. 12, 2011) ("the complaint, including the exhibits showing the parties' architectural drawings, states a claim for copyright infringement based on the similarities between the parties' designs. The Court makes no finding as to whether the designs are in fact substantially similar; rather, the Court cannot conclude as a matter of law at this stage that the designs are not substantially similar.") (*citing Gaito*, 602 F.3d at 64).

The core subject matter of Plaintiff's and Defendants' works is far more unique, and creative in its own right, than unicorns or American flags.  The particular manner of expression, although it has its differences, also has strong similarities.  We submit that one should be all the more circumspect when considering Defendants' arguments for a dismissal before discovery. *See Betty, Inc. v. PepsiCo, Inc*., 283 F. Supp. 3d 154, 169 (S.D.N.Y. 2017) ("Although there are differences between the two works – and Plaintiff concedes as much – the Court cannot conclude

as a matter of law that the works are not substantially similar; an "average lay observer [c]ould recognize the alleged copy as having been appropriated from the copyrighted work.") (*quoting Gaito*, 602 F.3d at 66).

Defendants argue that Plaintiff seeks to protect unprotectible ideas, variously suggesting that she seeks to protect the idea of a homegirl, or the idea of a hitman, or even the idea of hiring a hitman. None of those are true. Plaintiff claims the rights to the expression reflected in her videos, both of which depict the unique depiction of a service specifically designed to summon a homegirl to engage in violence or destruction on one's behalf, and which specifically depict the service using an order-and-arrival structure. The only substantive difference in the overall expression is that Plaintiff's original expression depicts a telephone dial-up service, while Defendants' infringing expression depicts the more modern analogue of a mobile telephone app. Defendants also attempt to argue that the service depicted in Defendants' show is designed for men, whereas that depicted in Plaintiff's videos is designed for women, but there is no suggestion in either the show or the videos that that is the case.[8] The more likely explanation is a practical one: Plaintiff plays all of the main parts in her videos herself (hence the customer and the homegirl are women), whereas the main players in Defendants' show are men.

Defendants then go outside the four corners of the Amended Complaint in an effort to try to make a prior art argument, writing: "Countless films and television series feature the concept of hiring a person to go to a certain location and intimidate and/or fight someone on the hiring party's behalf" (ECF 23 at 15), and then give a total of three examples, none of which inform the

---

[8] The first of Defendants' skits describes Homegrrl as: "The HomeGrrl app lets you order a homegirl to fight for you when your hands are tied." ECF 18 ¶ 33; ECF 25.

case.[9]  Neither of the first two examples ("The Hood Hitman" and "When Someone Needs A Beat Down") involves homegirls at all, but in each case the more standard (according to Defendants) hitman.  Also, neither depicts an order-and-arrival structure like the works at issue here.  As in *Vacchi*, the differences between overall structure and main characters are patent.

As to the third example – and only as to the third example – Defendants say "[e]ven the specific premise of hiring a 'homegirl' is unoriginal."  *Id*.  Of course – as Defendants remind the Court throughout their brief – nobody can protect a "premise," and Plaintiff does not seek to do so, but rather the expressive way in which the premise is presented in her videos, against the infringing manner in which the premise is presented in Defendants' episode.  The example Defendants cite ("Bon Qui Qui Opens Homegirl Saccurity Company") is a monologue by a character speaking to the camera in which she describes, but does not depict, her fictional service ("Call me.  I will track them down.  And I will cut them.").[10]

### C.  The Amended Complaint Sufficiently Alleges Claims Against Defendants of Contributory and Vicarious Copyright Infringement

Assuming that the Court concludes that Plaintiff has pled a claim for direct copyright infringement by the Defendants, it should also rule that Plaintiff has pled claims for contributory and vicarious liability.  The tests for vicarious and contributory copyright infringement were codified in this Circuit in a pair of cases in 1963 and 1971:

> When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials – even in the absence of actual knowledge that the copyright monopoly is being impaired, *see De Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944), *cert. denied*, *Hearst Magazines*

---

[9] These examples <u>are</u> mentioned in the Amended Complaint, because Defendants presented them in their motion to dismiss the original Complaint (ECF 12 at 15-16 & nn. 10-11), going outside the four corners of the then-operative document.

[10] If the Court views this video, it will note that the owner – MADtv – has only 11,000 subscribers, as compared to Plaintiff's more than 1 million.

> *v. De Acosta* 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945) – the purposes of
> copyright law may be best effectuated by the imposition of liability upon the
> beneficiary of that exploitation.

*Shapiro, Bernstein & Co. v. H. L. Green Co*., 316 F.2d 304, 307 (2d Cir. 1963).

> Although the Act does not specifically delineate what kind or degree of
> participation in an infringement is actionable, it has long been held that one may
> be liable for copyright infringement even though he has not himself performed the
> protected composition. For example, a person who has promoted or induced the
> infringing acts of the performer has been held jointly and severally liable as a
> <u>'vicarious' infringer</u>, even though he has no actual knowledge that copyright
> monopoly is being impaired. *Shapiro, Bernstein & Co. v. H. L. Green Co*., 316
> F.2d 304 (2 Cir. 1963); *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co*.,
> 36 F.2d 354 (7 Cir. 1929)….
>
> Similarly, one who, with knowledge of the infringing activity, induces, causes or
> materially contributes to the infringing conduct of another, may be held liable as a
> <u>'contributory' infringer</u>.

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc*., 443 F.2d 1159, 1161-62 (2d Cir. 1971)

(emphasis added).

Following the Supreme Court's 1984 and 2005 decisions in the seminal *Sony* and

*Grokster* cases, this Court reiterated these long-standing principles as follows:

> While "[t]he Copyright Act does not expressly render anyone liable for
> infringement committed by another," it "does not preclude the imposition of
> liability for copyright infringements on certain parties who have not themselves
> engaged in the infringing activity." *Sony*, 464 U.S. at 434-35, 104 S.Ct. 774.
> Through contributory infringement, one infringes "by intentionally inducing or
> encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v.
> Grokster, Ltd*., 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005).
> Vicarious infringement exists where one "profit[s] from direct infringement while
> declining to exercise a right to stop or limit it." *Id*.

*In re Cellco P'ship*, 663 F. Supp.2d 363, 370-71 (S.D.N.Y. 2009).

Critically, the vicarious test applies where one is profiting from the infringement and has

the power to control or supervise, <u>even in the absence of knowledge,</u> and the contributory test

applies <u>even if one is not making money,</u> as long as they know (or have reason to know) of the

18

infringement and induce or assist the direct infringer.  Plaintiff alleges that Defendants are not only direct infringers via their participation in the creation and dissemination of the infringing television program, but are also secondary infringers via their involvement with two other groups of direct infringers: HBO Max subscribers, and Defendants' undisclosed technology partners.

### 1. The Complaint Pleads Contributory and Vicarious Copyright Infringement Arising from Subscribers

Plaintiff's Second and Third Cause of Action allege that Defendants are secondary infringers by virtue of their liability arising from the primary infringements of HBO Max's subscribers.  In both causes of action, Plaintiff alleges the following:

> 98. HBO Max's subscribers have infringed and are infringing Manno's rights in her registered copyrighted Works by, *inter alia*, directing the service to publicly perform the Episode, and/or make reproductions of the Episode, all of which infringe Manno's rights in the Works.

> 99. HBO Max's subscribers are therefore directly infringing Manno's exclusive right of public performance, under 17 U.S.C. § 106(4), right of reproduction, under 17 U.S.C. §106(1), and right to create derivative works, under 17 U.S.C. § 106(2).

ECF 18 ¶¶ 98-99, 112-13.  Assuming *arguendo* that Defendants' episode infringes Plaintiff's videos, then further reproductions or public performances of the episode are further infringements under the Copyright Act.

Defendants' argument (ECF 23 at 24) that streaming performances of *That Damn Michael Che* are private – rather than public – performances, is fundamentally incorrect.  Defendants cite the Supreme Court's 2014 decision in *Aereo*, but *Aereo* actually reiterated that streaming performances to individual subscribers at different times and in different places are public (not private) performances, because the Transmit Clause of the Constitution specifically says that they are:

> The Transmit Clause must permit this interpretation, for it provides that one may transmit a performance to the public "whether the members of the public capable

of receiving the performance ... receive it ... at the same time or at different times." § 101. Were the words "to transmit ... a performance" limited to a single act of communication, members of the public could not receive the performance communicated "at different times." Therefore, in light of the purpose and text of the Clause, we conclude that when an entity communicates the same contemporaneously perceptible images and sounds to multiple people, it transmits a performance to them regardless of the number of discrete communications it makes.

*Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 447-48 (2014) (emphasis added).

Aereo was attempting to argue (based on the Second Circuit's earlier decision in *Cartoon Network*)[11] that because its system purportedly made a separate copy of the work for each subscriber before streaming it to each such subscriber, it was not performing publicly.  There is no allegation by Plaintiff or representation by Defendants that they are streaming personal copies of *That Damn Michael Che* to each of their subscribers, and in any event that argument was explicitly rejected by the Supreme Court in *Aereo*:

We do not see how the fact that Aereo transmits via personal copies of programs could make a difference. The Act applies to transmissions "by means of any device or process." *Ibid*. And retransmitting a television program using user-specific copies is a "process" of transmitting a performance. A "cop[y]" of a work is simply a "material objec[t] ... in which a work is fixed ... and from which the work can be perceived, reproduced, or otherwise communicated." *Ibid*. So whether Aereo transmits from the same or separate copies, it performs the same work; it shows the same images and makes audible the same sounds. Therefore, when Aereo streams the same television program to multiple subscribers, it "transmit[s] ... a performance" to all of them.

*Id*. at 448.

Defendants do not appear to challenge that their subscribers engage in actions that – if involving infringing material – would violate Plaintiff's reproduction right and derivative work rights in Section 106 of the Copyright Act, and, as discussed above, they would also violate Plaintiff's public performance right.  Plaintiff has thus alleged direct infringement on the part of

---

[11] *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008).

HBO Max's subscribers.  The next question, then, is whether Plaintiff has alleged claims against

Defendants for secondary liability based on the alleged direct infringement of the subscribers.

With respect to contributory infringement (Second Cause of Action), which requires

allegations of some kind of assistance or inducement, coupled with knowledge, the Amended

Complaint satisfies both elements:

> 100….Defendants enable, induce, facilitate, and materially contribute to each act
> of infringement by the HBO Max subscribers.
>
> 101. Defendants have actual and constructive knowledge that the HBO Max
> subscribers are employing the HBO Max service to publicly perform the Episode
> and make reproductions of the Episode, all of which infringe Manno's rights in
> the copyrighted Works.
>
> 102. Acting with this actual and constructive knowledge, Defendants enable,
> facilitate, and materially contribute to the HBO Max subscribers' copyright
> infringement, which could not occur without Defendants' enablement.

ECF 18 ¶¶ 100-02.

The "assistance or inducement" element is plainly satisfied – *That Damn Michael Che*

does not wend its way[12] from Defendants' servers to the subscribers' devices without substantial

and complete support from Defendants, who make the program available, along with the means

to stream and download the program.  Defendants also and separately, Plaintiff alleges, induce

their subscribers to stream and download the program in the same manner – by presenting them

with the opportunity and means, and encouraging them to see their latest offerings and latest

episodes.  The "knowledge" prong is also properly pled.  Defendants know that their subscribers

---

[12] *See Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000)
(finding "most logical interpretation of the Copyright Act is to hold that a public performance or
display includes 'each step in the process by which a protected work wends its way to its
audience.'") (*quoting David v. Showtime/The Movie Channel, Inc*., 697 F. Supp. 752, 759
(S.D.N.Y. 1988)).

are streaming and downloading *That Damn Michael Che*, which Plaintiff alleges infringes her copyrights.

The vicarious infringement test is also satisfied with respect to the HBO Max subscribers. This alternative formulation of secondary liability has two elements – direct financial benefit and the right and ability to supervise or control – and both are pled in the Third Cause of Action:

> 115. Defendants have both the right and the ability to supervise the HBO Max subscribers' infringing conduct, and to prevent them from infringing upon Manno's copyrighted Works.
>
> 116. Defendants significantly and directly benefit from the infringement by the HBO Max subscribers.
>
> 117. Defendants derive substantial revenue tied directly to the volume of subscribers that can be attracted to the HBO Max service, which is accomplished in substantial part by offering the broadest spectrum of domestic and international content to the subscribers for broadcast.

*Id.* ¶¶ 115-17.

The "direct financial benefit" prong is clear.  The Defendants derive profit from each of their subscribers, and in this competitive streaming environment Defendants are motivated to offer their subscribers content intended to induce them to subscribe, and to keep them as subscribers.  The "supervision/control" prong is likewise clear, as the Defendants self-evidently can see – and certainly do see – everything the HBO Max subscribers stream or download, including every subscriber who has streamed or downloaded Episode 6 of *That Damn Michael Che*.  Moreover, they most certainly also have the right to control their subscribers' behavior, as they have the power to cut off any or all of their subscribers from being able to access this particular content, or to deny them access when they queue it.

### 2.    The Complaint Pleads Contributory and Vicarious Copyright Infringement Arising from Defendants' Technology Partners

As discussed in the previous section, Plaintiff has pled claims for secondary copyright infringement against Defendants, based on the actions of the HBO Max subscribers, who are engaged in reproduction, public performance and creation of derivative works of the allegedly infringing episode.  Separately, Plaintiff pleads – properly – claims for secondary infringement against these same Defendants arising from the actions of their technology partners.

Defendants correctly point out that the Amended Complaint does not name these technology partners, as Plaintiff is obviously in no position to know, let alone the particular functions each one performs in the delivery of *That Damn Michael Che* to Defendants and ultimately to the HBO Max subscribers.  Indeed, the Fourth and Fifth Causes of Action are included in no small part in the Amended Complaint in anticipation of arguments by Defendants that those technology partners – and not Defendants – are the real infringers, perhaps using a "volition" argument akin to that advanced in the *Cartoon Network* case.  That being said, the claims are pled properly, and should not be dismissed.

The technology partners – those who facilitate the services provided by the Defendants, are plainly involved in actions that would qualify as copyright infringement if the content were infringing.  As pled in the Amended Complaint:

> 127. One or more individuals or companies involved in the technological processes used in the dissemination of the Episode across streaming platforms, which may include one or more of the Defendants (the "Technology Partners"), have infringed and are infringing Manno's rights in her registered copyrighted Works by, *inter alia*, bringing about the public performance of the Episode, and/or making reproductions of the Episode, all of which infringe Manno's rights in the Works.

ECF 18 ¶¶ 127, 141.

As discussed above, contributory copyright infringement is a two-element test consisting of assistance/inducement and knowledge, which is pled in the Amended Complaint as follows:

> 129.…Defendants enable, induce, facilitate, and materially contribute to each act of infringement by the Technology Partners.
>
> 130. Defendants have actual and constructive knowledge that the Technology Partners are bringing about the public performance of the Episode, and bringing about the making of reproductions of the Episode, all of which infringe Manno's rights in the copyrighted Works.
>
> 131. Acting with this actual and constructive knowledge, Defendants enable, facilitate, and materially contribute to the Technology Partners' copyright infringement, which could not occur without Defendants' enablement.

*Id*. ¶¶ 129-31.

The assistance/inducement prong is pled based on Defendants' delivery of the content to the technology partners for dissemination, along with Defendants' direction of the technology partners to do so.  Defendants' knowledge – as with the subscribers – is found in their awareness that they are delivering and ordering dissemination of *That Damn Michael Che*, the program Plaintiff maintains infringes her videos.

The vicarious test – right and ability to control/supervise and direct financial benefit – is pled as follows:

> 144. Defendants have both the right and the ability to supervise the Technology Partners infringing conduct, and to prevent them from infringing upon Manno's rights in the copyrighted Works.
>
> 145. Defendants significantly and directly benefit from the infringement by the Technology Partners.
>
> 146. Defendants derive substantial revenue tied directly to the volume of subscribers that can be attracted to the HBO Max service, which is accomplished in substantial part by using the Technology Partners to broadly offer and disseminate its programming – including the Program and the Episode – to a broad range of subscribers with robust, reliable technology.

*Id*. ¶¶ 144-46.

Much like the Third Cause of Action alleges vicarious infringement arising from the direct infringement by the HBO Max subscribers, the Fifth Cause of Action alleges vicarious infringement arising from the actions of the technology partners.  Defendants have a self-evident profit motive in disseminating *That Damn Michael Che* (and the rest of their programming) to their subscribers, and an equally self-evident profit motive in engaging their technology partners to make sure that the actual dissemination – which involves actual acts of reproduction, public performance and creation of derivative works – occurs quickly, smoothly and flawlessly. Defendants also have a self-evident right and ability to supervise and control their technology partners – the partners work for them, and Defendants undoubtedly can and do direct them in the service of the goal of maximizing dissemination and maximizing profits.

Assuming that the Court finds that Plaintiff has pled a claim for direct copyright infringement by Defendants, the Court should also deny Defendants' motion to dismiss the remaining claims, which plead cognizable and plausible secondary liability claims.

### D.      Defendants Have No Basis to Seek Attorney's Fees

Although Defendants do not elaborate at all upon their request for "attorneys' fees and costs pursuant to 17 U.S.C. § 505" (ECF 23 at 1), Plaintiff must oppose that request, both because the motion should be denied, and because all of Plaintiff's claims are plausible under the circumstances and made in good faith.  The videos have multiple objective similarities, and present what Plaintiff believes to be a unique expression of non-public domain ideas.  Plaintiff has pled her case using the information available to her without obtaining discovery, and Defendants' motion and request for fees should be denied.

### CONCLUSION

Defendants' motion to dismiss the Amended Complaint should be denied.

Dated: New York, New York  
       April 15, 2022

Respectfully submitted,

   /s/ Hillel I. Parness         
Hillel I. Parness  
PARNESS LAW FIRM, PLLC  
136 Madison Ave., 6th Floor  
New York, New York  10016  
212-447-5299  
hip@hiplaw.com  
*Attorneys for Plaintiff Kelly Manno*